**STATE OF NORTH CAROLINA; William W. Cobey, Jr., Secretary of the Department of Environment, Health and Natural Resources, Petitioners,**

v.

**FEDERAL AVIATION ADMINISTRATION; Samuel K. Skinner, Secretary of Transportation; James B. Busey, Administrator, Federal Aviation Administration, Respondents,**

Carteret County Crossroads, Incorporated; Home on the Range, Incorporated; Albemarle Commission; the Conservation Council of North Carolina; Valley Citizens For A Safe Environment; Downwinders, Incorporated; North Carolina Airspace Coalition, Incorporated; Citizen Alert, and the Rural Alliance For Military Accountability, Amici Curiae.

No. 90–1768.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1991.

Decided Feb. 24, 1992.

As Amended March 23, 1992.

---

Thomas Frederick Moffitt, Sp. Deputy Atty. Gen., and Isaac Clark Wright, Jr., Associate Atty. Gen., argued (Lacy H. Thornburg, Atty. Gen., on brief), North Carolina Dept. of Justice, Raleigh, N.C., for petitioners.

Martin William Matzen, U.S. Dept. of Justice, argued (Richard B. Stewart, Asst. Atty. Gen., Dirk D. Snel, U.S. Dept. of Justice, Sheila Hughes Rodriguez, Office of Chief Counsel, Federal Aviation Admin., Stephen A. Banks, Cdr. and Ronald Borro, Judge Advocate Gen. Corps, Department of the Navy, on brief), Washington, D.C., for Respondents.

John D. Runkle, Chapel Hill, N.C., on brief, for amici curiae.

Before ERVIN, Chief Judge, SPROUSE, Circuit Judge, and BUTZNER, Senior Circuit Judge.

## OPINION

BUTZNER, Senior Circuit Judge:

The State of North Carolina petitions for review of a final rule issued by the Federal Aviation Administration (FAA) in Airspace Docket 85–ASO–16, 55 Fed.Reg. 11897 (March 30, 1990) (to be codified at 14 C.F.R. Parts 71 and 73), revoking, realigning, and establishing restricted airspace over east-

ern North Carolina at the request of the Navy. The rule's principal deficiency, according to the State, is the FAA's failure to conduct an independent assessment of environmental impact, to consider the cumulative impact of existing and proposed restrictions of airspace, and to prepare an environmental impact statement. The State asserts that this and other deficiencies constituted violation of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347; regulations issued pursuant to that Act by both the FAA, Order 1050.1D, *Policies and Procedures for Considering Environmental Impacts* (1986), and the Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500–17 (1991); the Federal Aviation Act, 49 U.S.C.App. §§ 1301–1553, and implementing regulations, specifically FAA's *Procedures for Handling Airspace Matters,* 7400.2C (*FAA Handbook*). The State does not seek an injunction pending review, but it asks that we set aside the rule pursuant to 49 U.S.C.App. § 1486(d).

Concluding that the FAA properly issued the rule, we deny the petition.

## I

█ Jurisdiction to review the State's petition rests on 49 U.S.C.App. § 1486(a). The standards of review are well established. If supported by substantial evidence, the FAA's findings of fact are conclusive. 49 U.S.C.App. § 1486(e). We review questions of law *de novo.* 5 U.S.C. § 706.

█ A federal agency must prepare an environmental impact statement for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An agency must prepare an environmental assessment in order to determine whether an environmental impact statement is necessary. 40 C.F.R. § 1508.9 (1991). If the agency decides that no environmental impact statement is required because the proposed action will not have a significant impact, it reports its decision in a finding of no significant impact (FONSI). 40 C.F.R. § 1508.13 (1991). The standard of review of an agency's decision not to prepare an environmental impact statement is whether the agency's decision was arbitrary or capricious. 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–78, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989); *Webb v. Gorsuch,* 699 F.2d 157, 159 (4th Cir.1983). To apply this standard a

> court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citations omitted).

## II

Title 49 U.S.C.App. § 1522 directs the FAA, in consultation with the Department of Defense, to establish zones necessary for the national defense and to restrict or prohibit civil aircraft from flying in such zones. The FAA designates these zones as special use airspace. *FAA Handbook,* ¶ 7000. This case involves a type of special use airspace known as a "restricted area" within which flight of civil aircraft is restricted for safety. *FAA Handbook,* ¶¶ 7300, 7301. When the military is using the restricted area, civilian traffic is prohibited without advance permission. 14 C.F.R. § 73.13 (1991).

For many years prior to this action, the FAA had established and the Navy used four restricted airspace areas in northeastern North Carolina. The restricted airspace commonly known as Harvey Point was designated by three overlapping circles on the aeronautical chart for February, 1990, which has since been superseded, as R–5301A, R–5301B, and R–5301C. This 21.2 square nautical mile restricted airspace was used both to protect aircraft from the hazards of flying over a facility of the Department of Defense's explosive testing agency and as part of a flight path

for military aircraft using the Palmetto target. This airspace was continuously restricted.

The Navy used the airspace commonly known as the Palmetto target, designated as R–5302, for practice bombing. This airspace was restricted 15 hours a day and the floor was surface-level. It was most frequently used during the summer when the Dare County target, designated as R–5314, was closed as a result of potential fire hazards.

The airspace known as Stumpy Point, designated as R–5313, was a continuously restricted three nautical mile radius circle over the Stumpy Point target in Pamlico Sound, which was used as a target for conventional inert ordnance.

In December 1985, the FAA, acting on the Navy's request, initiated rule making proceedings to alter restricted airspace over Harvey's Point, the Palmetto target, and the Stumpy Point target. The Navy did not propose any changes to the Dare County target airspace. The initial proposal received much opposition based on aeronautical, social, economic, environmental, and procedural concerns. Federal and state agencies, local governments, organizations, and individuals critically commented. The Navy responded to these concerns by twice changing its proposal. After conducting two public hearings in North Carolina, the FAA issued its final rule modifying the restricted airspace for Harvey Point, the Palmetto target, and the Stumpy Point target in accordance with the Navy's revised proposal.

The modified Harvey Point airspace is now designated on the August, 1990 superseding aeronautical chart as R–5301. As finally revised, Harvey Point airspace is 10.2 square nautical miles rather than its original 21.2 miles. Its airspace is restricted only to protect aircraft from flying over the explosive testing agency facility, not to provide part of a flight path to the Palmetto target. Other portions of old Harvey Point airspace are redesignated into a modified Palmetto target airspace.

A portion of the old Palmetto target airspace is no longer restricted under the final rule, and the modified airspace includes a portion of what used to be Harvey's Point. It also includes additional airspace located at the southwest portion of the original Palmetto target. The new Palmetto target airspace is 65.2 square nautical miles, about one square nautical mile smaller than the old one. The reconfiguration of the Palmetto target airspace narrows the width of an air corridor running between it and the Dare County target. As modified, it is restricted only on 24–hours advance notice. The floor of most of the airspace was raised from the surface to 100 feet above ground level.

The final rule expands the Stumpy Point target airspace in order to accommodate laser-guided standoff weapon training. The Navy estimates the new airspace is 8.33 times greater than the old one. On the new August 1990 aeronautical chart, the original Stumpy Point airspace is designated by R–5313A. The original portion of Stumpy Point will no longer be continuously restricted. It will be restricted from 8:00 a.m. to 11:00 p.m., Monday through Friday, and during other periods on at least 24–hours notice by the Navy to operators of civilian aircraft. The additions to the original Stumpy Point airspace, R–5313B, C, and D, are located entirely over the water of the Pamlico Sound. They will not be restricted more than 20 hours per month.

### III

Initially, the FAA took the position that compliance with the NEPA was the Navy's responsibility. *See FAA Handbook,* ¶ 7005. It did not review or independently evaluate the Navy's environmental assessments but simply accepted the Navy's statement of compliance with the Act. North Carolina, the General Accounting Office, and the CEQ criticized the FAA's position.

■ Section 102(2) of NEPA, 42 U.S.C. § 4332(2), directs all federal agencies to comply with the Act. This provision precludes an agency from avoiding the Act's requirements by simply relying on another agency's conclusions about a federal ac-

tion's impact on the environment. *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1122–27 (D.C.Cir.1971).

An executive order authorized the CEQ to prepare regulations implementing NEPA, and the Supreme Court has reiterated that CEQ regulations are entitled to "substantial deference." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354–55, 109 S.Ct. 1835, 1847–48, 104 L.Ed.2d 351 (1989). The CEQ regulations directing federal agencies how to comply with § 102(2) of NEPA are set forth in 40 C.F.R. § 1500 (1991). The CEQ authorizes an agency to adopt an environmental assessment prepared by another federal agency after reviewing it and accepting responsibility for its scope and content. If the environmental assessment is adopted pursuant to 40 C.F.R. § 1506.3 (1991), the agency must issue its own FONSI. *Guidance Regarding NEPA Regulations*, 48 Fed.Reg. 34263, 34265–66 (1983).

Confronted with criticism from state and federal agencies, particularly the CEQ, the FAA revised its policy to conform with CEQ regulations. In calling for a review of the Navy's environmental assessment, the FAA's manager of operations cautioned that the Navy's proposal was highly controversial. In addition to the Navy's documentation, the operations manager submitted the proposed airspace changes and the environmental comments concerning the proposal. The director of the office of environment reviewed the Navy's supplemental environmental assessment and found that it was consistent with NEPA's procedural requirements. Scrutiny of the Navy's procedures was essential. "Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350, 109 S.Ct. at 1845.

In the final rule, the FAA disclosed that it had done more than a mere procedural review. The FAA listed the noise from the aircraft, the danger to wildlife, and the danger from the use of lasers as the three principal environmental concerns. The FAA reasoned that because the realignment of the airspace would not significantly alter the nature or extent of flight patterns, no significant impact on surface noise levels or wildlife would result. The FAA also found that because the Navy will not use lasers when the target contains puddles of standing water, there is no danger from reflected laser beams.

After reviewing and adopting the Navy's environmental assessment as amended, the FAA issued its own FONSI, taking responsibility for the scope and content of the Navy's assessment. At the time it issued its final rule, the FAA had not revised its *Handbook* to comply with the CEQ's regulations about adoption of another federal agency's environmental documentation. Nevertheless, we conclude that the FAA's acquiescence in the CEQ regulations, its independent review and adoption of the Navy's supplemental environmental assessment, and the issuance of its own FONSI, were sufficient to comply with NEPA and the CEQ regulations.

## IV

The State is justifiably concerned about the cumulative impact of existing and proposed special use airspace over eastern North Carolina and its coastal waters. FAA Order 1050.1D ¶ 34 requires consideration of cumulative impact in deciding whether or not to prepare an environmental impact statement. The CEQ regulations define a cumulative impact as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions ... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (1991).

 We agree with the State that these regulations require an analysis of the cumulative impact of the several existing and pro posed special use airspace in eastern North Carolina. *See Kleppe v. Sierra Club*, 427 U.S. 390, 409–10, 96 S.Ct. 2718,

2729–30, 49 L.Ed.2d 576 (1976). It is not necessary, however, for an agency to "always complete a comprehensive impact statement on all proposed actions in an appropriate region before approving any of the projects." *Kleppe*, 427 U.S. at 414 n. 26, 96 S.Ct. at 2732 n. 26. An agency violates section 102(2)(C) of NEPA only if it acts arbitrarily in refusing to prepare a comprehensive impact statement for an entire region. *Kleppe*, 427 U.S. at 412, 96 S.Ct. at 2731.

In addition to the modification of existing special use airspace made by the rule under review, the State identifies three other proposals that taken together may have an adverse cumulative impact on the environment. They are the Navy's Mid–Atlantic Electronic Warfare Range (MAEWR), the Air Force's Echo military operations area, and the Cherry I and Core military operations area. In its reply brief, the State mentions that the Marine Corps is also considering additional special use airspace in connection with expansion of Camp Lejeune.

The record compiled from the Mid–Atlantic Electronic Warfare Range is not before us, but we are told by the FAA, without contradiction by the State, that an environmental impact statement including a cumulative impact analysis was filed for this project. The State did not challenge the adequacy of this environmental impact statement.

The Marine Corps is preparing a supplemental environmental impact statement for the Cherry I and Core proposal. In connection with this proposal, the CEQ has instructed the FAA as follows:

> The FAA, as the agency with final authority over the designation of special use airspace, will be responsible for conducting the necessary cumulative effects analysis for the Cherry I and Core MOAs. In accordance with NEPA and the CEQ regulations, the FAA's decision with regard to the establishment of these MOAs must be supported by environmental documentation which contains a discussion of cumulative impacts. (footnotes omitted).

53 Fed.Reg. 36357, 36361 (Sept. 19, 1988). The FAA notes in its brief that the environmental impact statement as supplemented for the Cherry I and Core military operation areas will address the cumulative impact of the special use airspace at issue in this case as well as other restrictions.

Since the special use airspace under review modifies existing restricted airspace, the FAA could revise its rule in the future without facing the usual problem that "resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349, 109 S.Ct. at 1845. A cumulative impact analysis is therefore not necessary at this point, and it would be a waste of resources given the necessity for analysis of the cumulative impact of this and other proposals in connection with the Cherry I and Core military operation areas. Courts should not require wasteful duplication of effort. *See Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011, 1039 (2d Cir.1983). We conclude that the FAA did not act arbitrarily in omitting a cumulative impact analysis in its environmental documents prepared for the rule under review.

V

We next consider the State's argument that the rule is flawed because the FAA did not prepare an environmental impact statement. A federal agency must prepare such a statement "on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The key issue in this case involves the term "significantly." An agency's refusal to prepare an environmental impact statement is arbitrary and capricious if its action might have a significant environmental impact. *LaFlamme v. Federal Energy Regulatory Comm'n*, 852 F.2d 389, 397 (9th Cir.1988); *Citizen Advocates for Responsible Expansion, Inc. (ICARE) v. Dole*, 770 F.2d 423, 432–33 (5th Cir.1985). Because the FAA adopted the Navy's supplemental environmental assessment, we must consider that document, as well as the FAA's FONSI, in determining

whether the FAA's refusal to prepare an environmental impact statement was arbitrary and capricious.

Courts generally follow the CEQ's definition of "significantly." *See, e.g., Marsh,* 490 U.S. at 374 n. 20, 109 S.Ct. at 1859 n. 20. The CEQ defines "significantly" as a combination of context and intensity, with intensity being a function of ten factors. 40 C.F.R. § 1508.27 (1991). The State designates the following factors as relevant to this petition: "(1) cumulatively significant impacts; (2) degree of uncertainty regarding impacts; (3) degree of environmental controversy; and (4) threatened violation of federal and state laws." We discussed cumulative impact in part IV, *supra,* and we will discuss the other three factors in the order that the State has listed them.

CEQ regulations define the uncertainty factor in these terms: "The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5) (1991). The rule modifies existing special use airspace. Consequently, the conclusion that the impacts will be insignificant may rest in part on a comparison of the impacts from the proposed use with the impacts from existing uses. To the extent that modification conforms to existing uses, the environmental impact will generally be less significant than that produced by substantial revision. *Hanly v. Kleindienst,* 471 F.2d 823, 830–31 (2d Cir. 1972). *See also* Daniel R. Mandelker, *NEPA Law and Litigation,* § 8:34 (1984). The modifications of existing use in this instance are comparatively slight. The Harvey Point restricted area was decreased in size by about one half. The Palmetto Target airspace now encompasses part of the former Harvey Point airspace. Its reconfiguration resulted in a slight reduction in size, and it was moved entirely over water. Formerly it was restricted 15 hours every day. Now it is restricted only on 24-hours' notice. The modified Stumpy Point target area is over eight times as large as the former area. However, the enlarged, restricted airspace is located over Pamlico Sound and will be used only 20 hours a month. Restriction of the airspace over the original target area, which was formerly continuous, is now from 8 a.m. to 11 p.m. five days a week and for other periods on 24-hours' advance notice.

The Navy's supplemental environmental assessment addressed the concerns and comments relevant to the uncertainty of the rule's environmental effects. With the exception of the use of lasers, which is discussed below, the rule does not increase the number of training flights or vary their nature. The Navy predicted that noise levels will actually decrease near Harvey's Point and residences on the north shore of Albemarle Sound. The Navy also explained that because nonexplosive ordnance will continue to be used and there will be no significant increase in ordnance expended in the area, the water quality should not decline. The supplemental environmental assessment points out that the modified restricted airspace is over open water. No coastal zones or wetlands will be threatened by the rule. There are no endangered species unique to the area. The new restrictions will not affect wildlife other than the present and continuing threat to birds, which pilots of all aircraft are admonished to avoid.

In response to adverse comments the Navy changed its request, making the rule consistent with the North Carolina Coastal Zone Management Program. The closest historical site is over 20 nautical miles from the restricted airspace. The Navy moved the Stumpy Point target area entirely offshore, leaving the nearest wildlife refuge 18 nautical miles away. Also, the reconfiguration of the Stumpy Point airspace allows north/south air traffic between the Hyde County Airport and the Dare County Regional Airport even when restrictions are in effect.

The supplemental environmental assessment discusses in detail the effect of the proposal on recreational and commercial activities. It demonstrates that in general the restrictions will not significantly differ from those in effect prior to the issuance of the rule. In some respects they are less restrictive because the Navy modified its proposal by raising the floor of the air-

space from the surface to 100 feet except over bombing targets and the explosives testing site.

The Navy proposed expansion of the Stumpy Point target airspace to allow practice firing of Skipper II air-to-ship missiles. An A–6 Intruder fires these weapons four to five miles from the target and guides them to the target with a laser emanating from the A–6. In response to concerns about the effect of lasers on the environment, the Navy's supplemental environmental assessment addresses this subject in great detail, giving both a narrative and mathematical analysis of the precautions that have been taken to assure safety. The principal danger from lasers, according to the Navy, is reflection from standing water on the target. Lasers will not be used when the target contains puddles of standing water. The Navy will use fly-overs or safety observer planes to inspect the target.

The Navy took a hard look at the environmental effects of using lasers to guide missiles to the Stumpy Point target. As a result of its evaluation of relevant information, including the limitation of use of lasers to 20 hours a month, it issued a FONSI. Its decision, reached after careful analysis of the effects of lasers on the environment, was not arbitrary or capricious, and an environmental impact statement is unnecessary. *See Marsh,* 490 U.S. at 385, 109 S.Ct. at 1865.

Apart from the use of lasers to guide missiles to the Stumpy Point target, the other effects on the environment resulting from the modifications of existing restricted airspace at the Palmetto Point target and Harvey Point are not highly uncertain. Nor do they involve unique or unknown risks.

## VI

The CEQ regulations also prescribe that when determining whether a proposal has a significant impact on the environment, an agency should consider: "The degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.-27(b)(4) (1991). Paragraph 17 of Order 1050.1D also admonishes the agency's employees to consider whether an action would be "highly controversial on environmental grounds." Emphasizing that an FAA internal memorandum described the proposal as controversial and referring to the opposition the proposal engendered, the State asserts that the FAA violated the CEQ's and its own regulations by not preparing an environmental impact statement.

There is indeed legitimate controversy over the cumulative impact of this and other restricted airspace in eastern North Carolina. State, local and federal officials, interested individuals, and the General Accounting Office have expressed concern on this subject. The revisions of existing restricted airspace resulting from this rule are in themselves rather modest. Nevertheless, the restricted airspace as modified does contribute to the cumulative impact on the airspace of the entire region. Were it not for the current preparation of a supplemental environmental impact statement considering cumulative impact in connection with the Cherry I and Core projects, the FAA would be required to address this subject now. We conclude, however, that the controversy over the omission of a cumulative impact analysis in the rule under review has been satisfactorily resolved by the undertaking to prepare the supplemental environmental impact statement and the cumulative impact analysis that we discussed in part IV, *supra.*

There also was genuine controversy over the FAA's initial insistence that it could simply certify that the Navy had made an environmental assessment and issued a FONSI. This controversy, however, was resolved by the FAA's acquiescence in the CEQ's directions, its adoption, after review, of the Navy's environmental documents, and the issuance of its own FONSI. *See* part III, *supra.*

This circuit long ago rejected "the suggestion that 'controversial' must necessarily be equated with opposition." *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973). Otherwise, opposition, and not the reasoned analysis set forth in an environmental as-

sessment, would determine whether an environmental impact statement would have to be prepared. *Rucker,* 484 F.2d at 162. The outcome would be governed by a "heckler's veto." *River Road Alliance, Inc. v. Corps of Engineers,* 764 F.2d 445, 451 (7th Cir.1985).

Here, apart from the issues we discussed in parts III and IV, the final rule, which is quite different from the Navy's initial proposal, did not excite controversy sufficient to compel the preparation of an environmental impact statement.

### VII

■ The CEQ states that another factor that an agency must consider in deciding whether a proposal has a significant impact on the human environment is "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10) (1991). The State asserts that the FAA failed to comply with the review and consultation requirements of the Endangered Species Act, 16 U.S.C. § 1536, and the Department of Transportation Act, 49 U.S.C. § 303(c). The State also notes that the North Carolina Division of Parks and Recreation asked for a similar review but received no response. The State adds that it is not "raising these concerns as separate, substantive issues."

The record discloses that before the Navy revised its request, the United States Fish and Wildlife Service reviewed the proposal and called attention to endangered and threatened species in the area. Subsequently, the Fish and Wildlife Service commended the Navy for realigning the restricted airspace away from the shoreline, while at the same time it suggested the need for an environmental impact statement that would address the cumulative impact of special use airspace in eastern North Carolina. The Navy's supplemental environment assessment states that "[n]o endangered species are unique to the restricted area." The rule reiterates the Navy's finding that the modification of the airspace will have no significant impact on wildlife in the area. We conclude that the

Navy's response to the Fish and Wildlife Service's concerns satisfied the consultation requirements of the Endangered Species Act and the Department of Transportation Act. The Service's comments about cumulative impact are similar to other comments that we addressed in part IV, *supra,* of this opinion.

■ The State next asserts the environmental assessment did not comply with the requirement in § 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E), and 40 C.F.R. § 1508.-9(b) (1991) to discuss alternatives to the proposed action. In its brief the State specifies several alternatives it claims the FAA should have considered: more efficient use of existing special use airspace, elimination of some or all of the restricted airspace in question but not necessarily the training missions, more precise and stringent limits on the use of special use airspace, alternative at-sea locations for the training missions, creation of corridors free of special use airspace restrictions, and mitigation of noise impacts.

In an environmental assessment, the range of alternatives an agency must consider is smaller than in an environmental impact statement. *Olmsted Citizens for a Better Community v. United States,* 793 F.2d 201, 208 (8th Cir.1986) (citing cases). Furthermore, even if the FAA had issued an environmental impact statement, it would not have needed to discuss remote or speculative alternatives. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978); *Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 402 n. 19 (4th Cir.1977).

The Navy discussed various alternatives to the modification of the Palmetto target area. The Navy rejected the "no action" alternative because of its detrimental effects on combat readiness and safety. For the same reasons, it also dismissed any alternative modification of the airspace that did not provide realistic bombing patterns or a safe low level turn. The Navy found that eliminating the Palmetto target or moving it to another location, as sug-

gested by the State, was unacceptable because of the need for a nearby target when the Dare County range is unavailable.

The Navy also discussed alternatives to enlarging the Stumpy Point target in the supplemental environmental assessment. The Navy once again rejected the "no action" alternative because of the need to provide training in using the Skipper II missiles. It also dismissed any alternative location because of the Stumpy Point target's unique location for "war-at-sea training"—clear of sea lanes and airways yet close enough to be used by aircraft stationed on land. For safety reasons the Navy also rejected any alternative that would allow civilian aircraft into the area during the training exercise. The Navy did not discuss any alternatives to Harvey's Point, and there is no reason why it should have. The airspace there was already restricted, and the only effect of the rule was to reduce its size.

Bearing in mind that an agency has substantial discretion in its evaluation of alternatives, we hold that the discussion of alternatives was adequate for an environmental assessment. *See City of Aurora v. Hunt,* 749 F.2d 1457, 1467 (10th Cir.1984).

The State maintains the Navy violated 40 C.F.R. § 1501.4(b) (1991) by not involving "to the extent practicable" environmental agencies and the public in preparing the environmental assessments. The State emphasizes it received the Navy's initial environmental documentation only after a Freedom of Information Act request.

We agree the environmental documents should have been more readily available. *See* 40 C.F.R. § 1506.6 (1991). The State, the General Accounting Office, the Fish and Wildlife Service, and the Environmental Protection Agency, however, eventually did receive and comment on these documents. Other interested organizations and persons had an opportunity to comment at the two public hearings which the FAA held and at several public hearings the Navy conducted. The FAA did not adopt the Navy's environmental assessments until well after all these comments were in the record. We believe that the procedures eventually undertaken substantially complied with the CEQ regulations.

The State argues the FAA ignored several aeronautical comments, including impacts on airborne health care services and Civil Air Patrol search and rescue operations, impacts on enforcement and survey flights by the State's natural resources agencies, impacts on crop dusters, and past air crashes. Although the State does not specify what statute it claims the FAA violated, we presume it is the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553(c).

An agency establishing a rule need not respond to every comment. It must, however, reasonably respond to those comments that raise significant problems. *See Action on Smoking and Health v. Civil Aeronautics Bd.,* 699 F.2d 1209, 1216 (D.C.Cir.1983). The FAA's final rule responded to comments regarding impacts on health care service and search and rescue operations by noting both the need for emergency access to the restricted airspace and the Navy's willingness to provide such emergency access with minimal delay. Although the final rule did not discuss the enforcement and survey flights, the record indicates one of the three natural resources agencies—the Division of Forest Resources—was not adversely affected once the restricted areas were moved almost entirely offshore. Another one of the three state agencies submitted its comments before the Navy modified the proposal to activate some of the restricted areas only as needed on 24–hours' notice. The State did not press the issue after modification. The impact on crop dusters is negligible, as the rule reduced the size of Harvey Point, the only restricted area over land. The public comments noting four military airplane crashes are cryptic at best, especially since the Navy proposed the change in existing airspace, in part, to improve safety in the Palmetto target airspace. We hold the FAA was not arbitrary or capricious in choosing not to respond to these relatively insubstantial aeronautical comments.

## VIII

██ The State also alleges numerous violations of FAA Order 1050.1D, which is the FAA's regulations governing its compliance with NEPA. The State does not claim these violations standing alone constitute grounds for relief; instead, it argues they are further evidence that the FAA's decision was arbitrary and capricious. In addition to issues raised and discussed elsewhere, the State argues the FAA's finding of no significant impact did not contain a determination about lack of alternatives or minimization of harm. The State relies on 49 U.S.C. § 303(c) (sometimes called a § 4(f) determination), which pertains to projects requiring the use of publicly owned facilities such as parks, wildlife and waterfowl refuges, or historic sites.

The Navy's supplemental environmental assessment and the rule, however, point out that the modification of existing airspace did not encroach on any such facilities. The Dare County target includes a state lake and park, but the rule did not alter airspace over this area. Consequently, the FAA did not violate paragraph 41(g) of Order 1050.1D. This paragraph is applicable only when § 303(c) comes into play. In addition, the State's claim that the FAA does not meet the requirements under paragraph 103 is irrelevant, as that paragraph applies to major federal actions begun before, but unfinished on, NEPA's January 1, 1970, effective date. The rule under review does not involve such an action.

The State's argument that the FAA's notice of proposed rule making did not declare the Navy was the "lead agency," as required by Appendix 3, paragraph 3(b)(1), is also meritless, as there is no evidence that the Navy was the lead agency as defined by 40 C.F.R. § 1501.5 (1991). Indeed, the State's position on the FAA's responsibility to review projects independently for environmental impacts seems to presuppose the Navy was not the lead agency.

The State's complaint that there was no pro forma language in the final rule stating the FAA had complied with NEPA, as specified in Appendix 3, paragraph 3(b)(4), does not warrant setting aside the rule. Two paragraphs in the rule adequately described the FAA's compliance with the statute. This description was a reasonable substitute for the prescribed language. *See* 55 Fed.Reg. at 11900.

The State correctly points out that the FAA's finding of no significant impact did not address the State's coastal zone management program as required by paragraph 41(j) of the order. This omission is an understandable oversight given the State's concession almost two years earlier that the airspace restrictions as modified were not in conflict with its program.

The State also asserts that the FAA's FONSI did not support its conclusion with pertinent facts as required by paragraph 41(b) or "assess and document all relevant matters" as required by paragraph 41(d). It also notes that the FAA's FONSI did not follow the language set forth in paragraph 46 of the order.

There is no merit to these complaints. The FAA's FONSI referred the reader to the FAA's adoption of the Navy's environmental assessment and FONSI. The FAA explained that for the reasons set forth in those documents and on recommendation of the FAA Director, Office of the Environment, it concluded that the airspace proposal will result in no significant impact on the environment. While the FAA did not quote the language set forth in paragraph 46 of the order, the language used did convey the same message. Repetition of the information contained in the Navy's environmental assessment and FONSI would be wasteful duplication, which the agency rightly avoided. The FAA's reduction of paperwork was authorized by CEQ policy set forth in 40 C.F.R. § 1500.4 (1991) and *Guidance Regarding NEPA Regulations,* 48 Fed.Reg. at 34263. *See also Sierra Club v. United States Army Corps of Engineers,* 701 F.2d at 1039.

## IX

██ The State also maintains that the FAA's rule making violated provisions of

the Federal Aviation Act, 49 U.S.C.App. §§ 1301–1553, and the implementing regulations in the *FAA Handbook*. The State first complains that the FAA did not strictly limit the number and type of training flights that could occur in the restricted airspace, citing *FAA Handbook*, ¶ 7132. That paragraph states:

> The need for the proposed airspace must be definitive and able to support any resultant imposition on nonparticipants or affordance of priority to the special use proponent. Requirements such as "the containment of military activity" or "in support of national defense" or other similar statements in and of themselves are inadequate.

The State maintains that a Navy document reporting that no training occurs in the Harvey Point area is evidence that the FAA did not appropriately limit the restricted airspace. It argues that because the Navy issued a finding of no significant environmental impact based on a constant number and type of training flights, the FAA must limit the airspace so the number of flights cannot be increased or the type of weapons and aircraft altered.

Paragraph 7132, however, does not require the FAA to limit the restricted area solely to the activities that justify its creation. Rather, it requires only a detailed justification for creating the restricted area in the first place. Here the Navy provided a detailed justification, including the need to create a range for the new Skipper II weapons system and the need for more realistic and safer bombing runs in the Palmetto target area. The Harvey Point restriction is justified because it protects aircraft from the explosives testing site.

The State next claims the FAA rule was not an "efficient utilization" of navigable airspace as required by 49 U.S.C.App. § 1348(a), relying on a General Accounting Office report finding that the FAA does not have adequate data on the utilization of special use airspace. The State also cites FAA regulations warning against "unnecessary proliferation" of special use airspace areas, *FAA Handbook*, ¶ 7002(a), and encouraging the sharing of special use airspace, ¶ 7003. Paragraph 7003 further states that "all special use airspace proposals shall be specifically reviewed for a determination of whether the military requirement can be accommodated within, or by modifying, existing areas."

The rule in question does not increase the number of special use airspace areas, so there is no proliferation in violation of paragraph 7002(a); it only modifies existing areas, precisely as paragraph 7003 suggests. Furthermore, the Navy can reserve the airspace over the Palmetto target only with 24–hours' advance notice. The same restrictions apply to the new airspace surrounding the Stumpy Point target, with the added restriction that the Navy can reserve it only 20 hours per month.

Accordingly, we hold that the FAA did not violate the Federal Aviation Act or its own regulations in adopting the rule.

### X

We hold the FAA complied with the procedural requirements of NEPA, the realignment of the restricted airspace did not significantly affect the environment, and the rule did not violate the Federal Aviation Act, its implementing regulations, or the Administrative Procedure Act. Most importantly, the cumulative impact of all restricted airspace used by the military in eastern North Carolina is the subject of a supplemental environmental impact statement soon to be completed by the Marines. The FAA acknowledges that it must then address the cumulative impact of this and other existing special use airspace along with proposed special use airspace in the eastern part of the State and its coastal waters. That analysis need not be duplicated here. We therefore decline to set aside the rule in Airspace Docket 85–ASO–16.

PETITION DENIED.