Steven **KRICHBAUM**, Plaintiff,

v.

**UNITED STATES FOREST SERVICE; Robert Joslin, Regional Forester; and William Damon, Forest Supervisor, Defendants.**

Civil Action No. 96–1000–R.

United States District Court, W.D. Virginia, Roanoke Division.

July 3, 1997.

Steven Krichbaum, Staunton, VA, pro se.

John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, Robert P. Crouch, Jr., U.S. Atty., Roanoke, VA, for Defendants.

## MEMORANDUM OPINION

WILSON, Chief Judge.

Plaintiff Steven Krichbaum seeks judicial review, pursuant to the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706, of an administrative decision by the defendants, the United States Forest Service, Regional Forester Robert Joslin, and Forest Supervisor William Damon (hereinafter referred to collectively as "the Forest Service"). Krichbaum alleges that the decision to pro-

ceed with the Hematite Timber Sale of 187 acres in the 1.1 million acres of the George Washington National Forest (hereinafter "the Forest") violates the National Environmental Policy Act (NEPA) and the National Forest Management Act (NFMA). Krichbaum and the Forest Service have filed cross motions for summary judgment. Also pending are Krichbaum's motion for preliminary injunction[1] and the Forest Service's motion to limit review to the administrative record.[2] Upon an independent review of the administrative record, the court concludes that the Forest Service is entitled to summary judgment because its decision is not arbitrary or capricious, not an abuse of discretion, and not shown to be in violation of law.

## I

The Forest Service is charged with the responsibility of employing multiple use management principles to promote competing resources in our national forests. To that end, the Forest Service manages the 1.1 million acres of the George Washington National Forest for various uses, such as recreation, wilderness, and timber. The Final Revised Land and Resource Management Plan (hereinafter "the Plan") divides the Forest into eighteen management areas (MAs) based on the purpose that is emphasized in any given area. MA 17 consists of all areas designated for timber production. According the Plan, MA 17 is to provide sustained high-value timber production from stands[3] with balanced age distributions, while maintaining the "way of life" to which the residents of the area are accustomed.[4] *See* Administrative Record (hereinafter "AR") Tab 1, pp. 3–88 and 89. In accordance with the Forest Service's multiple use objectives, the Plan re-

quires timber sales "spatially distributed and timed to minimize adverse effects on wildlife, soil, water, recreation, and visual values in a cost efficient manner." *Id.* at 3–89.

When the Forest Service examined the area of the Forest that it later designated as the Hematite sale project area,[5] it found an imbalanced age and species distribution. *See* AR Tab 24. Because the area was not meeting the established goals for MA 17, the Forest Service proposed a timber sale to regenerate the area and further timber production. On February 10, 1995, the Forest Service prepared a scoping notice to notify the public of the nature of the proposed action and to solicit comments, sent the notice to all interested parties, and published it in the local newspaper. *See id.; see also* 42 U.S.C. § 4332(G) (requiring scoping notice).

In response to public comments, a Forest Service interdisciplinary team developed eight alternative proposals for managing the area, four of which were considered in detail. *See* AR Tab 59. It consulted the Forest Service Continuous Inventory of Stand Conditions (CISC database) for information on the age and species of the stands, and it performed a biological evaluation of how the sale would affect threatened, endangered, and sensitive species in the area. *See* AR Tabs 14–18 and 45. Based on this information and additional soil, water, and macroinvertebrate data, the team prepared an environmental assessment (EA) which analyzed the eight management alternatives and determined the effects each would have on soil, air, water, wildlife, biodiversity, timber, economic, recreation, visual quality, and heritage resources. *See* AR Tab 59. Of the eight, the preferred alternative called for the harvest of

1. The court notes that at no time during the consideration of this matter has there been any imminent threat of harm warranting a preliminary injunction. The Forest Service has not yet sold half of the Hematite project. Georgia–Pacific bought the other half, but it has voluntarily postponed any cutting because of this pending matter.

2. There are a number of other miscellaneous motions pending in this matter, but these are mooted by the court's decision today.

3. Management Areas are subdivided into compartments of 1,000 to 1,500 acres and then further divided into stands of 10 to 40 acres.

4. The Forest Plan establishes a "desired future condition" such as this for each MA.

5. The Forest Service designates an area much larger than, but including, the proposed sale area as the "project area." The Forest Service can then develop a variety of alternative proposals and fully evaluate the environmental effects the proposals will have throughout the surrounding forest area.

187 acres from eight different stands, by modified shelterwood cut,[6] and the construction of one mile of road to facilitate the harvest. On March 1, 1996, the Forest Service sent the predecisional EA to all interested parties and again solicited comments. Krichbaum and others responded.[7]

Krichbaum is a resident of Staunton, Virginia who regularly visits the Forest for recreational enjoyment. His objections to the sale involved an alleged lack of hard data on many issues; inadequate research; negative impact of roads and logging on various plant and wildlife species, recreation opportunities, and soil and water quality; uncertain boundaries of MA 18; and harvesting trees outside the Forest Plan's optimum range of ages. He also proposed his own plan for the project area. *See* AR Tab 65. The Virginia Department of Conservation Resources also submitted comments regarding the cutting of timber in an area it considered to be old growth forest. *See* AR Tab 66.

After considering and responding to the comments, the Forest Service found that the proposed sale would bring the area closer to MA 17's desired future condition. It also found that the sale would have no significant impact on the quality of the human environment, and, therefore, would not require the preparation of an environmental impact statement. *See* AR Tab 74. On May 17, 1996, the Forest Supervisor issued his Decision Notice to proceed with the timber sale. The Decision Notice, the Finding of No Significant Impact (FONSI), and the final EA were sent to all interested parties and published in the newspaper. Krichbaum appealed the sale July 4, 1996. The Regional Forester examined Krichbaum's objections and affirmed the Forest Supervisor's decision, finding that the EA addressed Krichbaum's issues and adequately supported the FONSI. *See* AR Tab 85. Krichbaum then filed this suit to obtain judicial review of the sale. Krichbaum has offered numerous affidavits

and studies to supplement the administrative record.

## II

■ As a preliminary matter, the court addresses the government's motion to limit review to the administrative record. Although a court normally reviews an agency's decision based on the administrative record and "not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Fort Sumter Tours v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1848, 134 L.Ed.2d 949 (1996), courts have allowed an expansion of the record if additional explanation of the decision is necessary for effective judicial review, if it appears that the agency relied on documents not in the record, if background information is necessary to clarify technical issues, or if there was bad faith in the agency's decision process. *See, e.g., Public Power Council v. Johnson*, 674 F.2d 791, 793–95 (9th Cir.1982). These exceptions may be particularly important when reviewing a decision under NEPA where a court must determine whether the agency considered all relevant factors. *Asarco v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980); *County of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1384–85 (2d Cir.1977). In this case, however, the court does not find it necessary to review extraneous material because Krichbaum has not shown that any of his proposed additions to the record are necessary to the court's effective review of the agency's decision.

None of Krichbaum's exhibits provide needed background information, raise questions that the agency failed to consider, or present evidence of bad faith. Instead, they merely criticize the Forest Service's methodology and decision to proceed with the sale. Supplementation of the administrative record "to determine the correctness or wisdom of the agency's decision" is specifically prohibit-

---

6. This cut is an even-aged harvest method designed to produce stands of trees that are the same age. Buyers harvest about 75% of the timber, leaving a canopy to allow the growth of new vegetation. *See Krichbaum v. Kelley*, 844 F.Supp. 1107, 1109 n. 4 (W.D.Va.1994).

7. Krichbaum also had provided comments prior to the EA in response to the scoping notice. *See* AR Tab 31.

ed. *Asarco,* 616 F.2d at 1160; *see also Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 (holding that court is not empowered to "substitute its judgment for that of the agency").[8] Because the materials submitted by Krichbaum challenge the correctness of the decision instead of presenting evidence of bad faith or relevant issues that were overlooked, the record does not need to be supplemented, and the court will grant the motion to limit review to the administrative record.

### III

■ Judicial review of the Forest Service's decision is governed by the APA, 5 U.S.C. § 706. To survive summary judgment, Krichbaum must point to facts in the administrative record that indicate the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If Krichbaum cannot, the Forest Service's decision stands.

■ Krichbaum claims the defendants have violated NFMA and NEPA and their implementing regulations. The court must use the "arbitrary and capricious" standard to review the agency's decision, keeping in mind any additional substantive requirements imposed by NFMA and NEPA. *See Krichbaum v. Kelley,* 844 F.Supp. 1107, 1111 (W.D.Va.1994), *aff'd,* 61 F.3d 900 (4th Cir. 1995) (hereinafter *"Kelley "*). Judicial review ensures that an agency take a hard look at the environmental effects and base its decision on a consideration of all the relevant factors. *See Robertson v. Methow Valley Citizens,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989); *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976);

*Kelley,* 844 F.Supp. at 1111. For the reasons stated below with regard to each of Krichbaum's counts, the court finds that the Forest Service is entitled to judgment as a matter of law.

### IV

■ Krichbaum's first claim alleges that the Forest Service violated the NFMA requirement to notify the public of its intention to cut old growth forest. The Forest Service responds that no old growth forest is included in this sale. The dispute arises from a difference in methodology and definition. The Forest Service does not qualify old growth forest on the basis of age alone or of a single age applied to all species. It looks at how the ecosystem functions as a whole and considers the condition of "related structural attributes ... [such as] tree size, accumulation of large dead woody material, number of canopy layers, species composition." AR Tab 3, p. H–1. From these general characteristics, the Forest Service has adopted interim definitions for determining old growth forest and has identified about 180,-000 acres of the Forest that it considers "old growth." AR Tab 1, p. 2–3. Under the Forest Service's definition, the age of a stand is a function of "the prevailing situation in the stand" and not the age of the oldest tree in the area. AR Tab 23. The Forest Service relied on the CISC database[9] and on a field team's examination of the project area in determining that the proposed sale includes no old growth forest. AR Tab 59, pp. 13, 44.[10]

Using a different definition of old growth forest, the Virginia Department of Conservation Resources identified ten acres of the sale as old growth. The Forest Service argues

---

8. Krichbaum should have submitted his exhibits to the agency. When Krichbaum submitted comments referring to research he felt was missing, the Forest Service requested more specific information on authorities with which it was unfamiliar. *See* AR Tab 59, A–8, pp. 5, 12. There is no evidence that Krichbaum ever provided the information, and most of the documents which he now asks the court to consider were never submitted to the agency during the decision process. Practical considerations of agency expertise demand that evidence be presented to the agency rather than the generalist court. *See Cronin v.*

*United States Dep't of Agriculture,* 919 F.2d 439, 444 (7th Cir.1990).

9. The CISC database inventories the age, species, and condition of every stand in the forest. *See* AR Tabs 14–18, 26, 39.

10. The Forest Service identified 387 acres of the original project area as old growth forest, and it included none of those acres in the final proposed sale. *See* AR Tabs 20, 55, and 59 p. 44.

that the state agency's definition of old growth is more simplistic and produces less representative stand ages because it uses a single age cutoff for all species, focuses on the older trees in a stand, and considers no factors other than age. The court need not concern itself with the merits of the competing methodologies, however, because the Forest Service is entitled to substantial deference on scientific questions within its area of technical expertise. *Sierra Club v. Marita,* 46 F.3d 606, 621 (7th Cir.1995) (holding the agency "is entitled to use its own methodology, unless it is irrational"); *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) (holding deference to agency methodology appropriate unless agency failed to address an essential factor). The Forest Service's method of determining old growth forest is not irrational, and therefore the court must defer to it.[11]

Assuming that the sale involved the cutting of old growth, Krichbaum's claim that the Forest Service hid this issue from the public [12] is, nevertheless, without merit. The Forest Service received and responded to public comments on the issue of old growth. The scoping notice stated that the project would involve the shifting of some acres to a younger age class. *See* AR Tab 24. Both Krichbaum and the Virginia Department of Conservation Resources raised the concern of cutting old growth areas in their responses to the scoping notice. *See* AR Tabs 31, 32; *see also* Tab 28 (other public comments regarding old growth). The Forest Service included old growth forest as one of the "significant issues that were developed from both internal and external scoping." AR Tab 41, Issue 6. The EA evaluated the old growth issue, and Krichbaum and the Department of Conservation Resources again responded on

March 30 and April 2, 1996. *See* AR Tabs 59, 65, 66. Contrary to Krichbaum's allegation, all this dialogue took place prior to the Decision Notice issued on May 17, 1996. AR Tab 74.

The court finds that the Forest Service is entitled to summary judgment on Krichbaum's first claim, Count I, because the decision regarding the impact of the sale on old growth forest is not arbitrary or capricious and because the public was notified of the issue.

**V**

Count II alleges that the Forest Service failed to obtain and use accurate scientific data regarding old growth forest and the viability of certain wildlife species. The challenge to the Forest Service's old growth information revisits Count I. Krichbaum's claim that the data collected by "competent professionals" in the Department of Conservation Resources conflicts with Forest Service data is insufficient to prove that the Forest Service used inadequate data. The Forest Service is entitled to rely on its own data and method of determining old growth. As stated above, the court must defer to the Forest Service's scientific methodology.

Krichbaum also complains that the Forest Service did not have "site-specific surveys and inventory data" on the trout in Crow Run and Little Run or on the management indicator species [13] and threatened, endangered, and sensitive species in the sale area. He argues that the lack of specific data prevented the Forest Service from making the appropriate environmental analysis. Krichbaum misunderstands the court's role. The

11. The court notes that use of the other definition of old growth would not be fatal to the sale. The Department of Conservation Resources ultimately concluded that the sale included only ten acres of what it considered old growth, and it conceded that "the cutting of these units would not cause a significant impact to the larger occurrence" of old growth. AR Tab 73. "There is no absolute command that old growth be cultivated at all costs." *Kelley,* 844 F.Supp. at 1116. As long as the Forest Service reasonably considers NFMA's concern for promoting natural forest conditions, see 36 C.F.R. § 219.27(g), a decision

to harvest an insignificant amount of old growth is within its discretion. *See id.*

12. Krichbaum alleges in his complaint that the "public was not notified that the logging of precious ancient forest was being planned until after the decision was signed."

13. A management indicator species is a species "which, by its presence in a certain situation, is believed to indicate the habitat conditions" that other species prefer. AR Tab 59, p. 25.

Forest Service is vested with broad discretion in this sensitive area, not the court.

The Forest Service is required to "keep current inventory data appropriate for planning and managing" forest resources. 36 C.F.R. § 219.12(d). "Inventories shall include quantitative data making possible the evaluation of diversity." 36 C.F.R. § 219.26. "Data and information needs may vary as planning problems develop." 36 C.F.R. § 219.12(d). As the Forest Service bears the responsibility of maintaining appropriate inventory data, it also enjoys broad discretion to use its expertise in deciding what data is necessary for a particular management decision.

■ In this case, the Forest Service evaluated the effects of the proposed project on both management indicator species and threatened, endangered, and sensitive species. 36 C.F.R. § 219.19 requires the Forest Service to "maintain viable populations" of fish and wildlife through the "maintenance and improvement of habitat for management indicator species." The short list of indicator species allows the Forest Service to assess the suitable habitat for many desired species while actually monitoring a limited number. *See Kelley*, 844 F.Supp. at 1114 (MIS are "monitoring proxies"). The EA detailed the habitat requirements of thirteen different indicator species. AR Tab 59, pp. 25–29. After determining that four of the species did not exist in the project area, the Forest Service discussed the effects that each proposal would have on the habitat conditions for the other nine species. *Id.* at pp. 29–33. In addition to analyzing the habitat for management indicator species, the District Wildlife Biologist detected six of the nine species in his field surveys in the project area.[14]

The Forest Service also considered the potential effects on threatened, endangered, and sensitive species. It reviewed the list of species likely to occur in the project area and their habitat preferences. It consulted with the Department of Conservation Resources to review its records of sensitive species occurring in the area. Finally, the biologist conducted field surveys to search for sensitive species or favorable habitat conditions on September 28–29 and October 23, 1995.[15] AR Tab 45, pp. 1–3; see AR Tab 1, Appendix L. Based on his own observations, research, and consultation with other experts, the biologist assessed both direct and indirect effects of the project on sensitive species. He considered thirty-eight species from the Plan's list of threatened, endangered, and sensitive species, but he found none of these species and no "habitat which would have a high probability of supporting" them in the project area. AR Tab 45, p. 3. Thus, the Forest Service concluded that none of the proposed alternatives would have a significant effect on threatened, endangered, and sensitive species. *See* AR Tab 59, p. 33.[16]

The court finds that the Forest Service considered the relevant factors and took the required look at the effects the sale would have on management indicator species and threatened, endangered, and sensitive species. "It may be that a more extended on-site investigation would have provided greater certainty on the question of the existence of sensitive species in the project area," but the "agency's less costly evaluation" was adequate. *See Kelley*, 844 F.Supp. at 1113. The Forest Service is not required to maintain inventories and data to Krichbaum's satisfaction, but only as necessary to make the decisions committed to its discretion. It considered its own data from the Forest Plan and other past analyses, consulted with Virginia state authorities with expertise on the subject, and surveyed the project area. The court concludes that the Forest Service considered sufficient information to comply with its statutory and regulatory obligations and to make a reasonable decision to proceed with the sale.

14. He found black bear, white-tailed deer, oven-bird, wild turkey, pileated woodpecker, and brook trout. *See* the Biological Evaluation, AR Tab 45.

15. Field data from these surveys is contained in AR Tab 44.

16. The project protects these species further via the provision that work should be suspended if "during implementation of the proposed project any [threatened, endangered, or sensitive species] are located." AR Tab 59, p. 33.

■ As to Krichbaum's specific complaint regarding an alleged adverse impact on the brook trout in Crow Run and Little Crow Run, the Forest Service determined that the expected "minor sediment increases would have no significant effect on habitat for fish or other aquatic life" in the project area. AR Tab 59, pp. 21–22. It assessed the amount of sedimentation each proposal would add to the streams. Compared with analyses of past projects, the Forest Service found that the current proposals would have no significant impact on beneficial uses of streams. *Id.* In addition, the Forest Plan requires any timber harvest to comply with Virginia's Best Management Practices to ensure that erosion "would not add any significant siltation to any" of the streams in the area. *Id.* at 31. In the opinion of the court, the Forest Service's determination that the Hematite sale would have no significant impact on Crow Run and Little Crow Run is not arbitrary or capricious. Therefore, summary judgment for the Forest Service on Count II is appropriate.

## VI

■ Krichbaum next claims in Count III that the Forest Service's failure to prepare an environmental impact statement violates 42 U.S.C. § 4332(2)(C). The Forest Service must prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If, however, the agency determines based on an EA[17] that the action will have no significant impact, then the more expensive and detailed environmental impact statement is not required. *See* 40 C.F.R. §§ 1508.9, 1508.13; *Kelley,* 844 F.Supp. at 1110–11. Having reviewed the EA, the court concludes that the Forest Service took the requisite "hard look" at the relevant environmental issues and that the 52–page EA with eight appendices contains the documentation and "reasoned elaboration required to support the agency's determination of no significant impact." *See Town of Orangetown v. Gor-*

*such,* 718 F.2d 29, 35 (2d Cir.1983) (holding court's role is to ensure that agency took " 'hard look' at the environmental consequences" and "convincingly documented its" FONSI), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 124 (1984). A FONSI is "a factual finding made by an agency with particular expertise in environmental matters," *id.,* and the court may overrule the agency finding only if it was arbitrary, capricious or otherwise contrary to law. *North Carolina v. Federal Aviation Administration,* 957 F.2d 1125, 1128 (4th Cir.1992). The court finds that the FONSI and the decision not to prepare a full-blown environmental impact statement are not arbitrary or capricious, and the Forest Service is entitled to summary judgment on this count.

## VII

■ Count IV alleges that the Forest Service failed to consider an adequate range of alternatives. The Forest Service must explore all reasonable alternatives before proceeding with a proposal, 40 C.F.R. § 1502.14; but it is not required to consider remote or speculative alternatives or alternatives that are inconsistent with the goals specified for the particular MA. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215–16, 55 L.Ed.2d 460 (1978); *Kelley,* 844 F.Supp. at 1119. Congress has decreed that the Forest Service manage the forest with multiple use principles. Fidelity to that decree requires trade-offs. *See Sierra Club v. Espy,* 38 F.3d 792, 802 (5th Cir.1994). The Forest Service must necessarily forge a compromise, and "it need not consider alternatives which are inconsistent with that compromise." *Kelley,* 844 F.Supp. at 1119.

■ While considering this sale, the Forest Service developed eight alternatives. It considered only four in detail because the other four did not comply with the Forest

17. "An environmental assessment is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming ...—is necessary." *Cronin,* 919 F.2d at 443 (*quoted in Kelley,* 844 F.Supp. at 1111).

Plan.[18] The four considered in detail included the "no action" alternative, the even-aged harvest of 249 acres with construction of one mile of road, the even-aged harvest of 160 acres with no road, and the even-aged harvest of 187 acres with one mile of road. The Forest Service chose the last of these alternatives because, in addition to meeting the project goals of providing economical timber products and regenerating the stands toward the desired future condition for MA 17, that alternative avoided harvesting in cultural heritage sites. *See* AR Tab 59, p. 10.

The court disagrees with Krichbaum's claim that these eight alternatives provided an insufficient range for the Forest Service to consider. Multiple use management requires the Forest Service to "emphasiz[e] some goals at the expense of others." *Kelley*, 844 F.Supp. at 1119. Because of this MA's timber emphasis, the Forest Service's discretion in evaluating alternatives, and the eight alternatives that were developed, the court finds that the Forest Service considered an adequate range of alternatives in making the decision.

Krichbaum specifically claims, however, that the Forest Service failed to consider the "no action" alternative in good faith, in violation of 40 C.F.R. § 1502.14(d). The record does not support this conclusion. The Forest Service considered both the advantages and disadvantages of each alternative. For example, the EA admitted that the "no action" alternative would have a more positive impact on some species, like the pileated woodpecker, than the other alternatives. AR Tab 59, p. 31. However, given the necessity of tradeoffs, the area's emphasis on timber production, and its nonconformity with the desired future condition for MA 17, the Forest Service's rejection of the "no action" alternative was not arbitrary or capricious.

Because the Forest Service developed and evaluated an adequate range of alternatives including a "no action" alternative, the Forest Service is entitled to judgment as a matter of law on Count IV.

## VIII

 In Count V, Krichbaum raises several complaints that seem to focus on a lack of proper public disclosure. The court first notes the abundant public participation in the Hematite sale decision process. The disclosure requirements of NEPA are designed to ensure that the agency receives relevant information from the public and thoroughly evaluates the environmental issues in a decision. *See Laguna Greenbelt, Inc. v. United States Dep't of Transportation*, 42 F.3d 517, 527 (9th Cir.1994). The court will not grant relief for a failure to disclose "if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met." *Id.* In this case, the record shows substantial public dialogue at three different stages of the decision-making process. Assuming there was a technical failure to disclose, however, the court finds that the Forest Service nonetheless enjoyed the benefits of the public's input and adequately considered the environmental impacts of its decision. The court now addresses the specific issues it can reasonably construe from the Count V.[19]

 Krichbaum complains that the Forest Service refused to divulge the location of MA 18, thereby keeping the public uninformed about a crucial aspect of the timber sale. Contrary to Krichbaum's claim, the Forest Service was not required to detail fully the location of MA 18, which consists of all riparian areas (referred to simply as "streams and lake shorelines") throughout the 1.1. million acres of the Forest. "Riparian areas have variable widths that are deter-

---

18. Alternative 5 was an uneven-aged program; none of the project area is allocated by the Forest Plan for uneven-aged management. Alternative 6 proposed the shelterwood cutting of 187 acres in an area that was found to be inappropriate for that method; also, the area did not have enough volume or value for the proposed commercial sales. Alternative 7 would have used the disfavored clearcutting in an area that was appropriate for modified shelterwood cutting. Alterna-

tive 8 was rejected because restoration of the area to its natural condition did not meet the Forest Plan objectives for MA 17. *See* AR Tab 59, pp. 11–12.

19. Krichbaum's complaint regarding old growth and the CISC data was discussed earlier and need not be repeated here.

mined by ecologically significant boundaries [such as soil, landform, and vegetation] rather than arbitrary distances. On-the-ground conditions determine the width of individual riparian areas." AR Tab 1, p. 3–92; *see also* AR Tab 1, Appendix K (detailed definition of riparian areas). Although MA 18 includes numerous areas that have no relation at all to the Hematite project area, Krichbaum argues that the Forest Service's failure to provide him a map of MA 18 was a tactic to hide important information from the public. Again, the record does not support this claim. The Forest Service disclosed the areas analyzed in and affected by the Hematite project, designed alternatives to avoid harvesting in riparian areas, and determined that there would be no significant impact on the water quality of Crow Run and Little Crow Run. The record also shows that Krichbaum and other members of the public raised their concerns regarding these streams. The court finds that the Forest Service's disclosure and analysis of the riparian areas affected by the project were sufficient.

■■■ Krichbaum next challenges the sale because it involves the harvesting of some trees that are older than the rotation ages set forth in the Forest Plan. Among the many standards for forest management, the Plan establishes ranges for the age at which the Forest Service should try to harvest various species. Because some of the stands in the sale exceed these ideal rotation ages, *see* AR Tab 1, p. 3–91; Tab 59, p. 36, Krichbaum argues that these stands cannot be cut. This argument is unpersuasive because it focuses on one standard imposed by the Plan to the exclusion of all others. The desired future condition for MA 17, as established in the Plan, includes stands with balanced age class distributions. AR Tab 1, p. 3–88. The Forest Service team found that the Hematite project area had imbalanced age distributions and formulated eight remedial alternatives. If rotation ages absolutely prohibited cutting of trees that had passed the goal range, the project area would continue to age

and the Forest Service could never achieve the balance prescribed for the area. The Forest Service has a responsibility under the Plan to work toward the desired future condition for each MA. *Cf. Kelley*, 844 F.Supp. at 1119 (holding that rotation ages do not "tie the agency's hands" when it "identifies a threat to the desired future condition" of the area). The proposed sale is not arbitrary or capricious, and the court, therefore, concludes that the Forest Service is entitled to summary judgment as to Count V.[20]

## IX

■■■ Krichbaum's final count alleges that the sale is inconsistent with the Plan. Forest Supervisor Damon found in the Decision Notice that the sale is consistent with the Plan and gave detailed reasons supporting his finding. *See* AR Tab 74, pp. 3–5. The issues which Krichbaum raises to show inconsistency with the plan—old growth, riparian areas, sensitive species, and rotation ages—have all been addressed elsewhere in this opinion. Because the court does not find this timber sale to be inconsistent with the Plan, the Forest Service is entitled to judgment as a matter of law.

## X

For the above-stated reasons, the Forest Service's motions to limit review to the administrative record and for summary judgment will be granted and Krichbaum's motion for preliminary injunction is moot.

---

**20.** Krichbaum's remaining allegations in Count V involve his disagreement with the agency's view of certain data but do not raise any issues of disclosure or other requirements for the Forest Service's decision.