**SIERRA CLUB, et al.**

v.

**F. Dale ROBERTSON, et al.**

**No. 90–2150.**

United States District Court, W.D. Arkansas, Fort Smith Division.

Oct. 22, 1992.

Mary M. Rawlins, Mena, AR, Michael H. Crawford, Hot Springs, AR, and William Ballard, Watson, OK, for plaintiffs and plaintiff-intervenors.

Winston Bryant, Jeffrey A. Bell, Arnold M. Jochums, and Charles L. Moulton, Atty. General's Office, Little Rock, AR, for plaintiff-intervenor, State of Ark.

J. Michael Fitzhugh, Charles E. Smith, Mark W. Webb, U.S. Attorney's Office, Fort Smith, AR, and Rebecca A. Donnellan and David F. Shuey, Dept. of Justice, Gen. Litigation Section, Environment and Natural Resources Div., Washington, DC, for defendants.

Searcy W. Harrell, Jr., Roberts, Harrell & Lindsey, Camden, AR and Steven P. Quarles, and Thomas R. Lundquist, Crowell & Moring, Washington, DC, for intervenor-defendants.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The Sierra Club and others have sued the Forest Service and some of its officers, challenging the agency's timber harvesting plans in the Ouachita National Forest ("Ouachita"). At issue is an alphabet-soup mix of acronyms representing various studies the agency has made regarding land use (especially timber management) in the Ouachita, and the federal statutes requiring these studies. Defendants have moved for judgment on the record. The motion will be granted.

## I.

### A.

The Ouachita consists of just less than 1.6 million acres located in twelve west-central Arkansas counties and two southeast Oklahoma counties. Timber has been a major industry in this area for decades. Recently, harvest methods have created an intense controversy between environmentalists on one side and the timber industry and Forest Service on the other. Simply put, in selected areas of the Ouachita, the agency wants to cut existing trees and grow pine trees of uniform height, which in turn will be harvested. (This method of timber production is known as even-aged management.) The plaintiffs in this lawsuit have a principled objection to any use of even-aged management techniques and the use of herbicides in clearing the forest for the growth of new pine. Plaintiffs have requested judicial review of this timber management scheme under the Administrative Procedure Act, 5 U.S.C. § 702. Their complaint raises claims under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347.

### B.

Before embarking on a plan of action, the Forest Service must give effect to numerous statutes and regulations. Congress passed NEPA and NFMA, and to these schemes of complex rules required the executive branch to add additional layers. For example, the Council on Environmental Quality issued regulations enforcing NEPA and the Forest Service issued regulations enforcing NFMA. NEPA requires an environmental impact statement ("EIS") from agencies contemplating "major" actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). NEPA also requires consideration of the unavoidable adverse environmental effects of a proposed action; the possible alternatives to the action; the relationship between short-run effect on the environment versus the long-run impact on productivity; and any irreversible and irretrievable commitments of resources effected by the action. 42 U.S.C. § 4332(2)(C)(ii)-(v). NEPA regulations also define the EIS process. *See, e.g.,* 40 C.F.R. §§ 1501.4, 1502, and 1508.11.

NFMA is of special significance to timber harvesting. It requires the Forest Service to develop land and resource management plans for the National Forest System. *See* 16 U.S.C. § 1604(a). For each National Forest, an interdisciplinary team prepares an integrated plan based on inventories of forest resources. In NFMA Congress directed the Forest Service to write regulations encompassing manifold purposes, including placing limits on the harvesting of timber on federal land administered by the Forest Service. The relevant NFMA regulations may be found at 36 C.F.R. § 219.1 *et seq.*

### C.

In 1986 the Forest Service approved a land and resource management plan for the Ouachita National Forest pursuant to NFMA and released an accompanying final environmental impact statement ("FEIS") pursuant to NEPA. In 1990 the Forest Service approved an amended land and resource management plan (the "Plan"), and issued a final supplement to the FEIS ("SEIS"). A selected land management alternative based on the Plan and the SEIS was selected in a Record of Decision ("ROD") dated March, 1990. Some of the plaintiffs filed an administrative appeal to the Forest Service Chief regarding the Plan and SEIS. The Forest Service Chief upheld both the Plan and SEIS in an appeal decision dated April 14, 1991.

In 1990 the Forest Service released a final EIS analyzing vegetation management alternatives for the Ouachita, Ozark, and St. Francis National Forests ("VMFEIS") and selected a vegetation management program pursuant to a record of decision ("VMROD"). The VMROD amends the Plan's approach to herbicide use. Some plaintiffs filed an administrative appeal of the VMFEIS and the VMROD to the Forest Service Chief. The Forest Service Chief upheld the VMFEIS

and VMROD in an appeal decision dated April 16, 1991.

## II.

■ Judicial review in this case is premised on the deferential "arbitrary and capricious" standard of the Administrative Procedure Act. *See* 5 U.S.C. §§ 706(2)(A) and 706(2)(C).[1] In reviewing agency actions under this statute, the court must hew to several well-established limitations. First, the agency's actions are presumed to be lawful and correct. Second, the agency's conclusions can be overturned only if arbitrary and capricious, giving due deference to the agency's expertise and judgment. Third, the agency's legal interpretations are controlling if they are reasonable with regard to statutes, and not plainly erroneous with regard to the agency's own regulations. *See Sierra Club v. Robertson,* 784 F.Supp. 593, 604 (W.D.Ark.1991). Plaintiffs bear the burden on all issues in this case: They must show that the agency's actions are arbitrary, capricious, or contrary to law, or their claims must fail. Defendants are entitled to judgment if plaintiffs fail to make a sufficient showing on an essential element of their case with respect to which they have the burden of proof. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–84, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). Absent proof of arbitrary action, the court must assume that the agency has exercised its discretion appropriately. *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976).

## III.

### A.

■ Plaintiffs argue that the agency violated a NFMA provision requiring an "integrated plan" by issuing the Plan and VMROD as separate documents. Pl. SJBr. at 1–4.[2] NFMA mandates that plans must "form one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents ... all of the features required by this section." 16 U.S.C. § 1604(f)(1). The court finds, based on the clear language of the statute, that the Plan and VMROD together constitute a "set" for the purposes of 16 U.S.C. § 1604(f)(1).

Plaintiffs similarly argue that the Plan and VMROD are "segmented," instead of being included in a single EIS because "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a); *see* Pl.SJBr. at 5–11; Pl.Resp.Br. at 17–18. The Supreme Court has concluded, however, that an agency may address separate courses of action in separate EISes, and such a choice may not be disturbed unless it is arbitrary. *Kleppe v. Sierra Club,* 427 U.S. at 412–14, 96 S.Ct. at 2731–32. Plaintiffs' brief does not state with any clarity why the agency's choice was arbitrary, and this claim must therefore fail. *See id.* at 412, 96 S.Ct. at 2731. The agency prepared two EISes which each addressed a different action. This is a reasonable choice because the Plan is a multi-resource management plan, while the VMROD concerns only vegetation management. The court will not disturb the agency's decision to create separate documents.

### B.

■ Plaintiffs argue that the agency has declined to comply with its duty to promulgate certain regulations pursuant to NFMA. Pl.Resp.Br. at 11–12. NFMA requires the Forest Service to adopt regulations specifying guidelines which "insure

---

1. Agency actions may be overturned only if they are

 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 * * * * * *

 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 * * *

5 U.S.C. § 706(2).

2. Although the Forest Service and the Timber Industry each filed a single brief requesting judgment as to all issues, plaintiffs chose to respond in two briefs, one in which they answered defendants' arguments, and another in which they asked for partial judgment in their favor.

that timber will be harvested from National Forest System lands only where ... protection is provided" for bodies of water and shorelines "from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment," where harvests are likely to contaminate water conditions or destroy fish habitat. *See* 16 U.S.C. § 1604(g)(3)(E)(iii). Plaintiffs contend that the agency has passed no implementing regulations for this subsection of the statute. Pl.SJBr. at 12. Plaintiffs are incorrect. 36 C.F.R. § 219.27(e) provides: "No management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment shall be permitted within these areas which seriously and adversely affect water conditions or fish habitat." (The phrase "management practice" must include timber cutting because it is broadly defined as a "specific activity, measure, course of action, or treatment," *see* 36 C.F.R. § 219.3.)[3]

█ Plaintiffs contend that the timber harvesting method must be chosen at the plan level, and that the agency's method of choosing harvesting techniques site-by-site is therefore unlawful. Pl.Resp.Br. at 1–2. Plaintiffs base this argument on their interpretation of 16 U.S.C. § 1604(g)(3)(F)(i), which requires the Forest Service to create regulations specifying guidelines for land management plans that insure that

> clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where ... for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

Plaintiffs argue that the agency violated this provision by failing to create a regula-

tion enforcing its provisions at the plan level, and by not making these determinations in the Plan. *See* Pl.Resp.Br. at 1–7.

Again, plaintiffs are wrong. First, a reasonable reading of the statute does not mandate that the agency create a regulation requiring that timber harvesting methods be in the plan. The statute merely requires that a regulation specify guidelines that insure that cuts be optimum (for clearcutting) or appropriate (for other cuts), and meet the objectives and requirements of the plan. The law merely indicates that the method chosen must meet the objectives and requirements of the plan. *See* 16 U.S.C. § 1604(g)(3)(F)(ii). Plaintiffs' reading of the statute (stressing guidelines for land-management plans) takes advantage of an intrusive term, and such an interpretation collides with another NFMA provision which requires only that a plan contain a *probable* method of timber harvest. *See* 16 U.S.C. § 1604(f)(2). A cursory reading of the statute refutes plaintiffs' arguments, without even giving the agency's preferred reading of the statute its due weight.

Second, the agency concluded that the choice of harvest method is a project-level decision rather than a planning-level decision. Plan at IV–31. The Plan deserves to be quoted:

> The final selection of harvest cutting method shall be made for specific areas in silvicultural prescriptions or environmental assessment. Clearcut, shelterwood, seedtree, group selection or single tree selection may each be used on specific sites where appropriate for the combination of site conditions and management objectives. The method selected should best meet the resource and vegetation management objectives of the management area, including objectives for biological diversity and long-term site productivity.... The final selection of

---

**3.** Plaintiffs' argument fails for another reason. Plaintiffs' challenge is barred by the six-year statute of limitations, because the regulations were first enacted in 1979, and amended in 1982. *See* 28 U.S.C. § 2401(a). In other words, plaintiffs' ability to challenge the alleged lack of

regulations has expired. *See Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988) (challenge under APA based on regulations' alleged failure to comply with NEPA was time-barred under 28 U.S.C. § 2401(a)).

harvest methods will be based on site-specific environmental analysis. *Id.* at IV–31 to IV–36. The agency's interpretation of NFMA is controlling unless unreasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). The court concludes that the agency's reading is reasonable because it allows site-specific analysis of the appropriateness of the cutting method. *See Resources Ltd. v. Robertson*, 789 F.Supp. 1529, 1536–37 (D.Mont.1991). Plaintiffs have therefore failed to prove that the agency's interpretation is unreasonable.[4]

### C.

■ Plaintiffs contend that "[t]he Forest Service fails to specifically identify in its Plan which lands are unsuitable in a number of categories and attempts to identify them only by category, verbally describing the category rather than actually identifying the lands either in its maps or in its [computer survey] data." Pl.SJBr. at 17. In other words, plaintiffs want more specificity, namely, a map. NFMA does not require acre-by-acre specificity, however, *see* 16 U.S.C. § 1604(k), and this court therefore will not require it. The statute commands the agency to "identify lands within the management area which are not suited for timber production ... and ... assure that ... no timber harvesting shall occur on such lands for a period of 10 years." *Id.* (The agency has created regulations regarding assessment of suitability, *see* 36 C.F.R. § 219.14.) The State of Arkansas, as plaintiff-intervenor, urges that the statute requires that the specific acres of such "lands" be identified. The agency has made a survey of each of the twenty management areas, specifying how many acres in each area are suitable or unsuitable, and has concluded that a total of 631,-852 acres are unsuitable for timber production. *See* ROD at 10. The agency's decision not to draw a map and make a site-by-site analysis of unsuitability is not arbitrary; rather, it is a reasonable interpretation of a statute within the agency's special expertise that the court will not disturb. *See Chevron U.S.A.*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83.

### D.

■ Plaintiffs' next target is the diversity requirement of NFMA. "Diversity" is defined as the "distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3. This court visited the diversity issue before in its opinion denying plaintiffs' third preliminary injunction motion. The court noted that

> NFMA directs, in well-qualified clauses, the Forest Service to write regulations to provide for the "diversity" of plants and animals to meet "multiple-use objectives" and also to provide, "where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan." 16 U.S.C. § 1604(g)(3)(B).

*Sierra Club v. Robertson*, 784 F.Supp. at 609. In fact, the statutory language is so qualified that "it is difficult to discern any concrete legal standards on the face of the provision." Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forests*, 64 Or. L.Rev. 1, 296 (1985). The Committee on Scientists ("the Committee"), which assisted in drafting the NFMA regulations, noted:

> Provision for "diversity" as required by NFMA is one of the most perplexing issues dealt with in the draft regulations. We believe it is impossible to write specific regulations to "provide for" diversity.

44 Fed.Reg. 26600–01. "Although the statement of policy [to provide for diversity] is clear, there remains a great deal of room for honest debate on the translation

---

**4.** Notably, here, too, plaintiffs failed to challenge the alleged lack of Forest Service regulations within the statutory six-year limit, *see su-* *pra* at n. 3, and, again, the court need not even address this issue.

of policy into management planning requirements and into management programs." *Id.* at 26608. The Committee did not recommend use of a diversity index because "there is no substantial agreement on the meaning or significance of the figures derived." *Id.* at 26609. The agency's judgment in assessing issues requiring a high level of technical expertise, such as diversity, must therefore be accorded the considerable respect that matters within the agency's expertise deserve. *See Kleppe v. Sierra Club,* 427 U.S. at 412, 96 S.Ct. at 2731; *Lockhart v. Kenops,* 927 F.2d 1028, 1034 (8th Cir.1991), *cert. denied,* ─── U.S. ───, 112 S.Ct. 186, 116 L.Ed.2d 148 (1991).

■ Plaintiffs raise nine points regarding diversity. *See* Pl.Resp.Br. at 10–17. Plaintiffs' arguments are unconvincing because they demonstrate mere disagreement with agency methodology, and plaintiffs have failed to show that the agency's methodology or choices are irrational. *See California v. Watt,* 712 F.2d 584, 590, 597 (D.C.Cir.1983). For example, plaintiffs note that there is no separate consideration of the distribution and abundance of tree species for each alternative in the Plan or SEIS. *Id.* at 10. A species-by-species analysis, however, is nowhere required. The agency instead made a stand-by-stand comparison, which does not appear to be an arbitrary method of calculation. Plaintiffs call into question the adequacy of the discussion of diversity in the VMFEIS, Pl. Resp.Br. at 13, without demonstrating that the VMFEIS is a necessary forum for such a discussion, or that it was arbitrary for the agency to exclude such a discussion from that document.

Other objections likewise question methodology. For example, plaintiffs object to the agency's use of "Brillouin's formula," a statistical construct that the agency used to measure beta diversity, *i.e.,* diversity between stands of trees. *Id.* at 11. The regulations require no specific formula, and, as noted above, the Committee would not recommend one. The agency chose a formula that does not appear arbitrary; hence, plaintiffs' argument fails. Similarly, plaintiffs attack the agency's analysis of

plant and animal communities as the basis for diversity comparisons. Pl.Resp.Br. at 13. This contention, again, merely represents a disagreement over methodology. In addition, plaintiffs complain that the agency's description of the "pre-settlement condition" is unfounded. The regulations require that forest planning attempt to attain the diversity "expected in a natural forest" and a "diversity of tree species similar to that existing in the planning area." 36 C.F.R. § 219.27(g). The pre-settlement condition is a baseline representing the natural forest before the area was settled and the forest first altered. SEIS at F–5. Plaintiffs object to the agency's conclusion that pine stands dominated certain portions of the Ouachita Mountains. The agency based this conclusion on correspondence with the Arkansas Natural Heritage Commission. The court must defer to the agency's discretion to accept this description of the baseline, whether or not the plaintiffs may have a contrary opinion as to the condition of the forest before the Europeans arrived. The court has noted before that its function in a record review case is not to resolve disagreements among experts or to judge the merits of competing views, *Sierra Club v. Robertson,* 784 F.Supp. at 608–09, and it declines to do so now.

Plaintiffs also contend that the agency has engaged in "type conversion." Pl. Resp.Br. at 16–17. This is another way of saying that the natural forest is being turned into a pine-tree farm. Some relatively small areas of the Ouachita Forest will be managed for production of pine timber. This is consistent, however, with the multiple-use objectives of NFMA. *See* 16 U.S.C. § 1604(g)(3)(B). The Plan provides for maintaining the hardwood components of other parts of the Forest. *See* Plan at IV–135 to IV–143; ROD at 26–27.

### E.

■ Plaintiffs attack the agency's inventory of resources. Pl.Resp.Br. at 7–10. NFMA requires that a forest plan be "based on inventories of the applicable resources of the forest," 16 U.S.C.

§ 1604(f)(3), and that the Forest Service issue regulations to "provide for obtaining inventory data on the various renewable resources." 16 U.S.C. § 1604(g)(2)(B). NFMA regulations require each Forest Supervisor to obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction. The regulations further require that the Forest Supervisor must make sure that the interdisciplinary team has access to "the best available data." The data must be stored for ready retrieval and comparison and periodically shall be evaluated for accuracy and effectiveness. And as information is recorded, it must be applied in any subsequent planning process. 36 C.F.R. § 219.12(d). The court has noted before that, by specifying "best available data," the interdisciplinary team must have access to the best data available in the agency, not some ideal type of data. *Sierra Club v. Robertson*, 784 F.Supp. at 608. The court has noted before that the Forest Service, as an agency of trained specialists, has the discretion to determine what constitutes the best information. *Id.*

Plaintiffs argue that the inventory is inaccurate with regard to tree species, wetlands, threatened, endangered, or sensitive species, cultural resources, age of stands, type of stands, diversity, and tree diameters and ages. Plaintiffs' litany of alleged deficiencies is difficult to follow. *See* Pl. Resp.Br. at 7–9. Some of plaintiffs' arguments are unsupported and thus fail to state a claim. Others are simply incorrect. For example, inventory information has clearly been provided for the following: tree species, age, habitat, and diversity;[5] wetlands and aquatic habitats;[6] wildlife and endangered species;[7] and cultural resources.[8] Otherwise, plaintiffs appear to disagree with how the agency carried out its inventory, but mere disagreement is not enough to state a claim. The court con-

cludes that plaintiffs' inventorying claims must fail because the Forest Service has considerable discretion in inventorying and plaintiffs have failed to persuade the court that the inventory has shortcomings that violate the arbitrary and capricious standard.

### F.

■■■■ Plaintiffs complain that no "herbicide-free, selection cutting with a timber-wildlife emphasis alternative" was considered. An EIS need only set forth alternatives sufficient to permit a reasoned choice. *See Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292, 1300 (8th Cir.1976) (*en banc*) (*"MPIRG"*), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977); *Sierra Club v. Froehlke*, 534 F.2d 1289, 1301 (8th Cir. 1976). NEPA does not require agencies to consider alternatives that do not achieve the purpose of the proposed action. *Olmsted Citizens for a Better Community v. United States*, 793 F.2d 201, 208–09 (8th Cir.1986). Here, the purpose of the Plan and SEIS was to develop overall guidance for multiple use of forest resources, and identify alternatives that maximize net public benefits in an environmentally sound manner. *See* 36 C.F.R. § 219.12(f); *Citizens for Environmental Quality v. United States*, 731 F.Supp. 970, 977 (D.Colo. 1989). The agency considered thirteen alternatives and their environmental consequences, *see* ROD at 19 to 22, SEIS at II–1 to II–79, Plan at IV–1 to IV–60, including a scheme emphasizing wildlife (Alternative S), and another emphasizing uneven-aged timber management (Alternative U). The court concludes that the Forest Service considered sufficient alternatives to permit a reasoned choice.

### G.

Plaintiffs aver that the agency has shown bad faith in its execution of the

---

**5.** *See, e.g.,* SEIS at III–6 to III–10, III–24 to III–27, IV–14 to IV–22, and Appendix F; Plan at IV–30 to IV–37, IV–47 to IV–52, and Appendix A.

**6.** *See, e.g.,* SEIS at III–9, III–18 to III–23, III–27 to III–28, IV–25 to IV–32.

**7.** *See, e.g.,* SEIS at III–11 to III–21; Plan at IV–39 to IV–47, and Appendix J.

**8.** *See, e.g.,* SEIS III–5 to III–6, IV–6 to IV–7; Plan at Appendix F.

SEIS. In creating an EIS, NEPA requires the agency to make a good-faith effort to consider the values that NEPA seeks to protect. *MPIRG*, 541 F.2d at 1299. The agency is required to compile an environmental study in part so that a court can determine the agency's good-faith compliance. *Id.* Plaintiffs argue that the agency skewed the EIS data in order to arrive at a particular result, that of even-aged management. *See* Pl.Resp.Br. at 21–22. For support, plaintiffs rely on a report (outside the administrative record) produced by their retained experts, Cascade Holistic Economic Consultants. *See* Pl.Exh. 19. The court has reviewed the EIS and found no bias evident to the layman's eye. Beyond that, this court declines plaintiffs' invitation " 'to serve as the second at a duel between expert opinions.' " *Sierra Club v. Robertson*, 784 F.Supp. at 609, quoting *Village of Palatine v. United States Postal Service*, 756 F.Supp. 1079, 1086 (N.D.Ill. 1991).

### H.

 Plaintiffs aver that the SEIS and VMFEIS fail to address certain "unaddressed/unmonitored negative impacts," *i.e.*, water monitoring, channel damage, watershed and wetlands protection, and water quality. Pl.Resp.Br. at 22–24. An EIS need only provide sufficient information to permit a reasoned choice, and such information need not be exhaustive. *See MPIRG*, 541 F.2d at 1300. The need for more in-depth study may be deferred until a specific action is proposed and a site-specific environmental assessment is prepared. *See Sierra Club v. Robertson*, 784 F.Supp. at 602–03. The agency addressed the water issues in sufficient depth to provide sufficient information to permit a reasoned choice. *See* SEIS at II–77, III–18 to III–22, III–27 to III–28, IV–23 to IV–31, Appendix G, and Appendix I–13 to I–15; VMFEIS at IV–97 to IV–116. Although plaintiffs allege a lack of monitoring measures, Pl.Resp.Br. at 23, monitoring measures are provided in the Plan. *See generally* Plan, ch. V. Plaintiffs also contend that the agency failed to consider other "relevant factors" in the SEIS and VMFEIS, but these were in fact either considered or their consideration was not required by law. *Compare* Pl.Resp.Br. at 24–25 *with* SEIS at IV–22, IV–23 to IV–30, D–3 to D–7, and I–8.

### IV.

 In its brief, the State of Arkansas, as plaintiff-intervenor, restated many of the arguments that were rejected above. The State's brief also raised a new issue. The State introduces into this litigation the argument that the Plan does not comply with the State of Arkansas's water quality regulations. As near as the court can tell from a perusal of the administrative appeals, this theory was not raised previously, and the State makes no effort to show the court that this specific issue was preserved for review. The court is obliged to decline consideration of issues not raised before the agency for reasons explained in a prior ruling of this court:

> "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). Generally speaking, failure to raise an issue in the administrative appeals process precludes the district court from hearing the merits of that issue. *See Arp v. Railroad Retirement Board*, 850 F.2d 466, 467 (8th Cir.1988). This principle applies, of course, to issues not raised in an appeal from Forest Service actions. *See National Forest Preservation Group v. Butz*, 485 F.2d 408, 411 (9th Cir.1973).

*Sierra Club v. Robertson*, 784 F.Supp. at 600–01. It would be unfair for the court to consider allegations based specifically on State water quality regulations that had not been submitted to the agency in its appeals process. To hear such allegations where no exceptional circumstances counseling relief would appear to obtain, would

be not only unfair, but in complete disregard of the agency's administrative processes. In sum, the State's failure to present arguments to the agency in the first instance forecloses this court's ability to consider them.

## V.

For the foregoing reasons, the court having considered and rejected all arguments advanced by the plaintiffs and the plaintiff-intervenor, judgment will be granted in favor of defendants, and the case dismissed.