Steven **KRICHBAUM**, Plaintiff,

v.

George Wayne **KELLEY**, in his official capacity as Forest Supervisor of the George Washington National Forest, and United States Forest Service, and Deeds Brothers, Inc., Defendants.

Civ. A. No. 93–103–H.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Feb. 9, 1994.

Shay Clanton, pro se.

Kim Clanton, pro se.

Steven Krichbaum, pro se.

Michael McHale Collins, Collins & Mooney, Covington, VA, for Deeds Bros, Inc.

Richard A. Lloret, U.S. Attys. Office, Roanoke, VA, John Ebersole, Office of Gen. Counsel, Dept. of Agriculture, Atlanta, GA, for George Wayne Kelley and U.S. Forest Service.

## OPINION

MICHAEL, District Judge.

This matter is before the court on plaintiff's motion for a preliminary injunction, and upon the federal defendants' motion for summary judgment. Other motions will be resolved by separate order. For the reasons that follow, the court finds that summary judgment in favor of the defendants is appropriate, and therefore will deny plaintiff's motion for a preliminary injunction as moot.

### I.

Plaintiff Steven Krichbaum, *pro se*, commenced this action on December 14, 1993,[1] seeking judicial review of actions undertaken by the United States Forest Service and George W. Kelley, Forest Supervisor for the George Washington National Forest. The action, which was brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.* (1977 & supp.1992),[2] challenges Supervisor Kelley's October 28, 1992 decision to implement the Marble Valley Timber Sale. Administrative Record, Tab 89.[3] That sale provides for an "even-age" timber cutting[4] in a 114-acre portion of the Deerfield Ranger District of the George Washington National Forest.[5] Plaintiff's

---

1. Shay and Kim Clanton, the other plaintiffs in this action, were dismissed at the February 1, 1994 hearing in the case. That dismissal is set forth in a separate order.

2. Jurisdiction and venue are uncontested, and Mr. Krichbaum has exhausted his administrative remedies.

3. Defendant–Intervenor Deeds Brothers, Inc. won the contract for this sale.

4. "Even age" methods are intended to produce stands of trees of essentially the same age. The particular even-age methods chosen for this project are the "modified shelterwood cut," which harvests roughly 75% of the merchantable timber but leaves a forest canopy beneath which new vegetation is expected to grow, and (to a lesser extent) the "removal" cut, which removes that canopy once a newly-forested stand has emerged beneath it. *See* Administrative Record, Tab 14, Glossary.

5. The area is more particularly described as compartments 694 and 703 of the Deerfield District, in what is designated as Management Area 14 in the Land and Resource Management Plan issued for the Forest in 1986, and as Management Area 15 in the revised version of that Plan, issued in January, 1993. *See* Administrative Record, Tabs 2, 12, 89, 116.

complaint asserts that the planned sale is in violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* (1977 & supp.1993), and the National Forest Management Act, 16 U.S.C. §§ 1600, *et seq.* (1985 & supp.1993).

The court issued a temporary restraining order against the sale on December 15, 1993. Thereafter, the court scheduled a hearing on plaintiff's motion for preliminary injunction on February 1, 1994. Both parties consented to a period of continuance longer than ten days. Fed.R.Civ.P. 65(b). At the February 1 hearing, the court also heard arguments upon the federal defendants' motion for summary judgment. As indicated, the court finds that the motion for summary judgment is proper and dispositive of all other matters in the case.

## II.

Summary judgment is appropriate when there are no genuine issues of material fact which could support a finding for the non-moving party, such that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the court, as here, reviews the decision reached by an administrative agency, the summary judgment motion stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review. Though the court has taken testimony to clarify plaintiff's assertions, and to elicit from the defendants those portions of the administrative record which are thought to respond to those assertions, the factual record in this case has not been augmented in any way.[6] To survive summary judgment, then, plaintiff must point to facts in the administrative record—or to factual failings in that record—which can

support his claims under the governing legal standard.

But because the factual record in this case is closed, there would be no point to any further proceedings even if plaintiff were to survive summary judgment and prevail on his motion for a preliminary injunction. Thus, in this posture, plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits. For these reasons, the trial on the merits will be advanced and consolidated with the hearing on the motion for a preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2); *Cronin v. United States Department of Agriculture,* 919 F.2d 439, 444–45 (7th Cir.1990).

In essence, the court treats plaintiff as if he had moved for a *permanent* injunction upon a closed evidentiary record, even though technically the court is adjudicating defendants' motion for summary judgment. Each motion directs the court's attention to the question whether the agency's actions, as conclusively established in the record, comply with the law. The governing legal standard is a heavy one from plaintiff's perspective: agency determinations are not to be disturbed unless they are "arbitrary and capricious."[7] That standard, set forth in the Administrative Procedure Act ("APA"), is not altered by the more substantive statutes which underlie the APA claim.

The first of these "substantive" statutes, and the basis for a number of plaintiff's claims, is the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.,* which might more accurately be described as prescribing *procedural* prerequisites to agency action. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Specifically, a federal agency must prepare an environmental impact statement for a major federal action "significantly affecting the quality

---

6. The court has reviewed the extensive administrative record in this case, and has determined that the issues are framed with sufficient clarity so as to obviate any necessity for further factual development. *See Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam).

7. More precisely, the court is to set aside agency actions, findings, and conclusions when they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §§ 706(2)(A), (C).

of the human environment." 42 U.S.C. § 4332(2)(C). In order to determine whether an environmental impact statement must be prepared, the agency may first prepare an "environmental assessment," 40 C.F.R. §§ 1501.3, 1508.9 (1992), which one court has aptly described as a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement ... is necessary." *Cronin*, 919 F.2d at 443.[8] If the agency decides that an environmental impact statement is not required because the proposed action will have no significant impact, it reports that decision formally in a finding of no significant impact, or "FONSI." 40 C.F.R. § 1508.13. The Supervisor made such a finding in this case on October 28, 1992, along with a Decision Notice approving the Marble Valley Timber Sale, and it is this finding that plaintiff contests.

■■■ The decision not to prepare an environmental impact statement pursuant to NEPA is subject to the same "arbitrary and capricious" standard which applies in APA actions. *State of North Carolina v. Federal Aviation Administration*, 957 F.2d 1125, 1128 (4th Cir.1992) (citations omitted). In order to apply this standard, the court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971)). In the NEPA context, the court is called upon to evaluate whether the agency has taken a "hard look" at the environmental consequences and to determine whether its conclusion was based upon a good faith judgment, informed by the relevant factors. *State of North Carolina v. Hudson*, 665 F.Supp. 428, 437 (E.D.N.C.1987), *aff'd* 940 F.2d 58 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1991).

The second substantive basis for plaintiff's APA claims is the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600, *et seq.*, which guides the Forest Service in its management of federal lands. NEPA regulations are made applicable to NFMA in 16 U.S.C. § 1604(g)(1). Plaintiff argues that the logging project is inconsistent with the Revised Forest Plan issued in January 1993, Administrative Record, Tab 12, and, more fundamentally, with the statute's command that forest planning must provide for diversity of plant and animal communities consistent with multiple use management objectives. 16 U.S.C. § 1604(g)(3)(B).[9] Though the statute does restrain agency forest planning to some extent, the statutory command to "provide for diversity"[10] is a qualified one, and has required courts to defer substantially to the Forest Service's judgment and technical expertise. *See Sierra Club v. Robertson*, 810 F.Supp. 1021, 1027–28 (W.D.Ark. 1992). Thus, plaintiff's NFMA claims are properly evaluated using the APA's arbitrary and capricious standard, bearing in mind whatever substantive commands can be culled from NFMA and its implementing regulations.

Before proceeding further, it is important to clarify the place of the Forest Plan in the court's review. Under NFMA, 16 U.S.C. § 1604, the Forest Service is required to formulate a comprehensive planning docu-

---

8. An environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact [;] ...." and "[s]hall include brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

9. National Forests are managed to promote a number of potentially competing resources, including recreation, timber, range, watershed, and wildlife. 16 U.S.C. § 531(a). Some of these aims are particularly highlighted when even-age methods are proposed. Specifically, such methods may only be used when cuts "are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource." 16 U.S.C. § 1604(g)(3)(F)(v). Nothing in plaintiff's pleadings advocates an alternative cutting method, as opposed to no cutting at all.

10. Diversity is the "distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3 (1993).

ment for each land area under its management. The Plan that governed at the time this project was conceived was released in 1986, supported by an environmental impact statement. Administrative Record, Tabs 1, 2. The supporting documentation for the Marble Valley Timber Sale is "tiered" to the Plan documents; that is, the sale documents incorporate by reference the analysis and management direction specified in the Plan and its environmental impact statement. *See* 40 C.F.R. § 1508.29.

The 1986 Plan has undergone revisions resulting in a new Plan, issued in 1993. The Forest Service has certified that the timber sale is in compliance with this Plan as well. Administrative Record, Tab 116. Mr. Krichbaum has appealed this revised version, and argues that implementation of the timber sale before there has been a decision on the Revised Plan would be unjust. The court declines to enjoin planned agency actions simply because their justification may now be reflected in a Plan that is under administrative appeal. An injunction might be in order if the court found that the agency was acting in bad faith by delaying action on the appeal, but that situation does not obtain here.

More importantly, the court finds that the Revised Plan does not depart so dramatically from its predecessor, in terms of the broad issues raised in this case, that this court should forestall review pending the outcome of Mr. Krichbaum's appeal.[11] The documentation for the timber sale, though it draws on the management direction specified in the Plans, is largely freestanding in its assessment of site-specific environmental impacts. Neither of the Plans will be considered except to the extent they are marshaled in support of the current timber sale. Because the Plans are substantially similar in the respects material to this case, the court will cite to the Revised Plan documentation when citation to the Plans is necessary at all.

With this delineation of the scope and standard of review in this case, the court will now undertake to evaluate each of plaintiff's

claims. The claims are addressed separately for clarity, but the issues presented in each of them tend to overlap. For this reason, the court's treatment of each claim has application to other, similar claims and should not be taken in isolation.

*Count I: Improper Environmental Assessment*

 Plaintiff asserts that the biological evaluation, upon which conclusions in the environmental assessment were based, was so inadequate as to violate NEPA, as implemented in accompanying regulations. Mr. Krichbaum states that the agency's one-day field survey of the project area, and its consultation of inadequate databases, provided an insufficient basis to conclude that the timber sale would not impact threatened or sensitive species.

The agency's wildlife biologist visited the project area in June, 1992, and before completing his report consulted with a Forest Service botanist and ecologist, and wildlife and fisheries biologists from the Virginia Department of Game and Inland Fisheries. Biological Evaluation at BE–5, *in* Administrative Record, Tab 87. Each of the Virginia biologists, one of whom visited the site, indicated that he saw no adverse impacts upon any sensitive species. Administrative Record, Tabs 82, 85. The agency also consulted the Virginia Natural Heritage database, which turned up nothing in the specific project area, but a few species in the general vicinity. Administrative Record, Tabs 83, 87 at BE–4. To be sure, the absence from the Natural Heritage database of data for this project site does not necessarily indicate that no sensitive species reside there, *see* Administrative Record, Tab 83, but in conjunction with the other sources consulted, the court finds that the agency was neither arbitrary nor capricious to take the results of the database search at face value.

In addition, contrary to plaintiff's assertions, the agency *was* concerned with the impact of its proposal on plants and nongame wildlife. Again, the agency biologist

11. This argument has never been central to Mr. Krichbaum's claims, and the Forest Service has not asked the court to require plaintiff to exhaust his appeal of the Revised Plan before proceeding with this action. This supports the court's conclusion that resolution of this dispute will not require a ruling on the lawfulness of the Forest Plans.

consulted a botanist, and took care to review in his report the project's potential impact on the riffle snaketail dragonfly and the loggerhead shrike, non-game species located in the region but not in the project area. Administrative Record, Tab 87, at BE–4.

Plaintiff is correct that, as a general matter, NEPA requires high quality information, accurate scientific analysis, expert agency comments, and public scrutiny. 40 C.F.R. § 1500.1(b). This case is testimonial enough to the adequacy of public scrutiny in the agency proceedings. The other requirements must be evaluated in light of the particular purpose of the environmental assessment, which the regulations themselves stress as a *brief* discussion of the need for the project and its environmental impacts. *See* 40 C.F.R. § 1508.9. It may be that a more extended on-site investigation would have provided greater certainty on the question of the existence of sensitive species in the project area. It does not follow, however, that the agency's less costly evaluation was infirm in light of the statute or the NEPA regulations.

Indeed, at the level of the biological evaluation, the agency has developed objectives and workable standards to insure that it identifies and assesses the impact upon sensitive species. *See* Forest Service Manual §§ 2672.41–43 *in* Administrative Record, Tab 39. Those standards, in keeping with the intended brevity of an environmental assessment, envision identification of species by means of "informal consultation" with existing state resources, informed by the knowledge and experience of the individuals conducting the evaluation. *Id.* at § 2672.42. This is precisely what the agency did. As the Regional Forester indicated in his decision on Mr. Krichbaum's administrative appeal, the identification of *additional* sensitive plants and animals is beyond the scope of this discrete project. Administrative Record, Tab 114, Issue 14. NEPA regulations do require that agencies must have the capability to "identify methods and procedures ... to insure that presently unquantified envi-

ronmental amenities and values may be given appropriate consideration." 40 C.F.R. § 1507.2(b). The procedures used in this environmental assessment are not deficient, however, simply because they did not bring to bear every possible means of identifying species which existing resources had not yet uncovered.

Plaintiff states that two other considerations should have put the agency on notice that a more searching analysis was required. The first is the presence within the project area of the Clayton Mill Spring special interest area, which is a 37–acre area protected from any logging. Plaintiff argues that, given the acknowledged existence of sensitive ecosystems in the Clayton Mill Spring area, the agency was called upon to evaluate the "interconnectivity" between the area and other portions of the project area. Next, plaintiff suggests that, although not unique, the habitat in the project area is within parameters known to support sensitive species.

These arguments are unavailing. Each is highly speculative, and suggests no real limits on the degree of inquiry an examiner would have to make. If the agency's biologists were required to examine the specific interaction of a special interest area with its surroundings (even though this presumptively has been accomplished in the establishment of the area's boundaries), or to examine all areas which theoretically could support sensitive species (regardless of whether these areas are unique or whether any such species have actually been noted there), there would be little point to an environmental assessment. The regulatory scheme does not demand a complete environmental impact statement in every case.[12]

The court therefore concludes that the biological evaluation is sufficiently complete on its face, and that plaintiff can point to no specific facts to the contrary. Summary judgment will be granted as to count I.

*Count II: Reliance Upon Inadequate Inventories and Data*

█ This count is very similar to count I, except that it draws mainly from the agen-

---

**12.** Even the Final Environmental Impact Statement for the Revised Forest Plan, a much more detailed document than the environmental assessment prepared for this project, sets forth the wildlife demographics of the Forest by resort to experience and consultation rather than systematic, acre-by-acre analysis. Administrative Record, Tab 14, at 3–159—3–161.

cy's parallel responsibilities under NFMA. Title 16 U.S.C. § 1604(g)(2)(B) directs the Forest Service to promulgate guidelines which provide for the collection of inventory data on forest resources. The agency responded with at least two regulations relevant here. The first, 36 C.F.R. § 219.12(d), generally requires that resource inventories be kept, and the second, 36 C.F.R. § 219.26, requires that such inventories include "data making possible the evaluation of diversity in terms of its prior and present condition." In various Freedom of Information Act requests, plaintiff sought from the agency copies of inventories prepared for the project area. *See, e.g.,* Administrative Record, Tab 103. When the agency answered only with a reference to the biological evaluation, *see* Administrative Record, Tab 104, plaintiff concluded that the Forest Service was not complying with NFMA regulations, particularly regarding small organisms.

The court declines to find the agency in violation of NFMA simply because it has not prepared inventories as plaintiff would define them, that is, detailed lists of the plant and animal contents of each management area. Such lists are not necessarily required, inasmuch as "[d]ata and information needs vary as planning problems develop from identification of public issues, management concerns, and resource use and development opportunities." 36 C.F.R. § 219.12(d). What the agency has done, in addition to preparing the site-specific biological evaluation, is to compile area-specific population data for various "management indicator species" in the project area. *See* Administrative Record, Tab 73; 36 C.F.R. § 219.19(a)(1). These species are chosen as monitoring proxies for a number of other plant and animal species. *See* Administrative Record, Tab 14, at app. J. It is true that these species may not perfectly represent the sorts of wildlife plaintiff would like to see monitored, but the regulations specifically allow this approach. Moreover, "diversity" is so vaguely defined in this statutory and regulatory scheme that the court is hard-pressed to find in it any substantive command to consider any particular creature. *See* 36 C.F.R. § 219.3. The court therefore concludes that the management indicator species approach at the planning level, par-

ticularly when combined with the more site-specific information provided in the biological evaluation, furnishes more than enough of an "inventory" to permit a reasoned evaluation of diversity under NFMA.

For these reasons, summary judgment will be granted as to count II.

*Count III: Inadequate Consideration of Biodiversity*

■ Plaintiff's essential claim here is a fundamental dispute with the Forest Service over the meaning of diversity. Plaintiff states that the agency fails to promote diversity when it strives to create a mosaic of even-aged tree stands within this management area; for plaintiff, this practice may guarantee a diversity of appearance, but not necessarily a wide spectrum of plant and animal life throughout the management area. Plaintiff asserts that the agency's emphasis on promoting game animals and marketable timber will have detrimental effects on developed and developing ecosystems within the project area. Mr. Krichbaum suggests that the Forest Service simply is not managing for the whole range of diverse plant and animal life.

The agency responds that it is entitled to manage for diversity by featuring various target species in each management area of the Forest. *See* Administrative Record, Tab 88, at 26. management area 15, which encompasses the project area, is designed to be "a mosaic of hardwood and pine stands with varying ages that provide habitat for a variety of wildlife species preferring habitat ranging from permanent forest openings to hardwoods of mast-bearing age." Administrative Record, Tab 12, at 3–79. This is the so-called "desired future" of this area within the grand scheme of the Forest Plan. *Id.* The effects of this management philosophy were addressed at the site-specific level in the environmental assessment, which identified no long-term effects on any wildlife. Administrative Record, Tab 88, at 28–29. In the agency's judgment, the detriment to some creatures, if any, was outweighed by the strengthening of habitat for others featured in this particular area, and by the perceived need to remove marketable timber

from the path of the gypsy moth. Administrative Record, Tab 12, at 2–35, Tab 88. The agency even expects a greater diversity of timber and other vegetation in the regeneration areas following the cutting. Administrative Record, Tab 88, at 19.

Diversity is defined only as the "distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan." 36 C.F.R. § 219.3. It is perhaps the case, as Mr. Krichbaum indicates, that any logging in the Forest will disturb the ecological communities that have developed or are developing there. But nothing in the statute or its regulations requires that the naturally occurring forest ecosystems in a particular area are the sole yardstick by which diversity must be measured.[13] In short, this is a managed environment. Every pro-diversity command in the regulatory scheme is qualified to permit multiple-use management goals:

> Management prescriptions, *where appropriate and to the extent practicable,* shall preserve and enhance the diversity of plant and animal communities ..., so that it is at least as great as that which would be expected in a natural forest.... *Reductions in diversity ... may be prescribed only where needed to meet overall multiple-use objectives.*

36 C.F.R. § 219.27(g) (emphasis supplied). The Forest Service put it even more clearly in response to one of Mr. Krichbaum's comments on the Revised Forest Plan:

> The Forest Service will use ecosystem management as the means to meet goals specified in the Revised Plan. Ecosystem management is the means to an end. It is not the end itself. The Forest Service does not manage ecosystems just for the sake of managing them or for some notion of intrinsic ecosystem values. They are managed for specific purposes such as producing, restoring, or sustaining certain ecological conditions, desired resource uses and products, vital environmental services,

and aesthetic cultural or spiritual values. For the Forest Service, ecosystem management means to produce desired resource values, uses, products or services in ways that also sustain the diversity and productivity of ecosystems.

> This is neither product-oriented bias nor a nature-oriented bias. In some places, the emphasis is on ecological conditions and environmental services. In others, it is on resource products and uses. Overall, the mandate is to protect environmental quality while also producing on a sustainable basis, resources that people need.

Administrative Record, Tab 16, at I–345.

Because the court is unable to determine that the Forest Service has misunderstood or misapplied its mandate regarding biodiversity, summary judgment will be granted as to count III.

*Count IV: Inadequate Consideration of Natural Forest Conditions*

■ Plaintiff contends that the Forest Service has violated NFMA by failing to consider adequately the potential of the project area, absent the timber sale, to develop into "old growth" forest. Plaintiff rightly asserts that NFMA commands preservation and promotion of natural forest conditions. 36 C.F.R. § 219.27(g). Once again, however, Mr. Krichbaum deemphasizes the management deference explicitly conferred by the statute and its implementing regulations. It is true that old growth characteristics are a management indicator species for the Forest under the Revised Forest Plan, but the agency is only just now developing policies for promoting natural forest conditions consistent with its statutory mission to develop other forest resources. The Revised Forest Plan implements interim rules for old growth management, and it is these rules which guide the agency with regard to the Marble Valley Timber Sale. *See* Administrative Record, Tab 12, at 2–3—2–6.

At the project level, the Forest Service has maintained historical data on the forest

---

13. According to the Forest Service in its environmental assessment for this project, "it is extremely important that forest managers take a broadscale perspective toward managing for diversity across the landscape, not maximum diversity on each acre of the forest." Administrative Record, Tab 88, at 19.

growth conditions in compartments 703 and 694, the project compartments. Administrative Record, Tabs 26, 34. The information was updated as recently as May, 1992, and a biological evaluation of the present growth conditions was made in October, 1992. Administrative Record, Tabs 87, 88. A study of the stand conditions in the Marble Valley Timber Sale Area was conducted in January, 1993 to assure compliance with the interim standards articulated in the Revised Forest Plan, and no old growth stands were found to be threatened. Administrative Record, Tabs 106, 116.

It may be, as plaintiff suggests, that the agency's method of protecting old growth and old growth potential may prove to be crude and ultimately inadequate once the agency's old growth standards are fully articulated. But again, this is a managed forest whose "natural condition" is becoming a consideration only now, not even a century after clearcutting dramatically altered its evolution. There is no absolute command that old growth be cultivated at all costs. The agency is therefore entitled to develop an old growth management policy consistent with its other objectives, provided it gives ample and serious consideration to the statutory concern regarding natural forest conditions. The court finds that the agency in fact has given sufficient consideration to this concern, and for that reason, summary judgment will be granted as to count IV.

*Count V: Insufficient Analysis of Fragmentation and Edge Effects*

█ This claim alleges that the Forest Service has inadequately assessed the effects of the timber sale in terms of its propensity to create fragmentation and edge effects. These are detrimental ecosystem effects resulting from the discontinuity of forest cover caused by logging and logging access roads. The effects may include increased light, wind, and predator penetration into the forest interior, with accompanying effects on biodiversity.

While the court recognizes plaintiff's concern, it can find nothing arbitrary and capri-

cious about the agency's treatment of this diversity-related issue. Edge effects were under direct consideration by the agency, in that one of the purposes of the sale was to create forest edge habitat for some species, such as deer, without substantially harming other creatures who require uninterrupted forest conditions. Administrative Record, Tab 88. At the level of the Forest Plan, the agency has exempted portions of a number of management areas from activities that would fragment the forest. Administrative Record, Tab 12. But other areas, such as the Marble Valley Area, are being managed with different goals in mind, such as timber production. *Id.*[14] This is not to say that the agency ignored fragmentation even at this site-specific level. The environmental assessment specifically indicates that the selected alternative results in a substantial preservation of unbroken forest. Administrative Record, Tab 88. Moreover, it is the agency's judgment that while the newly-created edge effects impair some species (if only temporarily), on balance, plant and animal diversity is served rather than diminished. *Id.* at 28–29.

Plaintiff's main concern, it would appear, is that the agency has yet to undertake a detailed analysis on the effects of its action on existing ecosystems within the project area. The agency, for its part, candidly admits that its approach to fragmentation as a factor relevant to biodiversity is "rudimentary." *Id.* at 20. But this is because the agency feels that fragmentation needs to be addressed in greater detail at the Forest Plan level before it can be a featured management issue in individual project areas. *Id.* Fragmentation can be adjudged beneficial or detrimental only with reference to a desired outcome, so the deferral to Plan-level policymaking is not unreasonable. *See* Final Environmental Impact Statement, Revised Forest Plan, *in* Administrative Record, Tab 14, at 3–165. Mr. Krichbaum's impatience with the pace of change at the Plan level does not translate into a finding that the agency is arbitrary and capricious as to this project. It is clear to the court that fragmentation *is*

---

**14.** The selection of this particular area for potentially fragmenting activities is not unreasonable given its current fragmentation. As Mr. Krichb-

aum admits, the area already contains a number of roads, many from past timber sales.

being managed at both the Plan and site levels in a reasonable fashion based on the current state of knowledge. *See id.* Summary judgment therefore will be granted as to count V.

### Count VI: Inadequate Consideration of Special Biological Area

■ Plaintiff claims that the Forest Service has improperly neglected to assess the impact of its actions on the Clayton Mill Spring Special Interest Area, a site which the parties agree is off limits to logging due to its unique ecological significance. The dispute here is over the degree to which the agency is responsible for assessing the effects on the special interest area, if any, due to logging outside its perimeters. Mr. Krichbaum argues that an indirect effects analysis is required by NEPA regulations, 40 C.F.R. 1508.27, which require the agency to evaluate the significance of a given environmental impact partly in terms of the proximity of the project area to unique ecological areas. NFMA regulations may require a similar evaluation of tree stands adjacent to those slated for "vegetative manipulation." 36 C.F.R. § 219.27(b)(4).

The Forest Service does not take issue with its duty to address indirect effects. It points out, however, that there will be no cutting within 1300 feet of the spring itself, nor within 600 feet of the special interest area boundary,[15] nor within the spring's drainage area. Moreover, indirect effects in the vicinity of the spring were addressed directly in the Forest Plan. The Revised Plan enlarged the protected area from 25 to 37 acres, presumptively setting the required bounds for the area's protection. Administrative Record, Tab 12, Tab 14 at 3–179.

Plaintiff points to nothing that would indicate that these boundaries are inadequate. In fact, one state biologist consulted for the biological evaluation offered his opinion that the current management of the special interest area was adequate. Administrative Record, Tab 82. It may be that to assure maximum protection of unique values such as those recognized in the Clayton Mill Spring area, the agency should replace "buffer

zones" with case-by-case evaluations of indirect effects. But nothing in plaintiff's argument indicates that the agency's chosen response to protecting the special interest area's value is in violation of the law; the law requires serious consideration of factors such as indirect impacts, but it specifies neither a methodology for weighing such factors, nor a desired outcome. Because the record on its face supports the inference that the Forest Service seriously considered the Clayton Mill Spring and its surroundings, summary judgment will be granted as to count VI.

### Count VII: Inadequate Consideration of Riparian Areas

■ Plaintiff asserts that the Forest Service has not adequately assessed the impact of its action on soil and water quality in the project area. As defendants suggest, this too is essentially a dispute over methodology. The agency maintains that it is entitled to employ relatively generic management practices in this area. Specifically, the agency consulted county soil data, Administrative Record, Tab 28, and soil and water data from environmental assessments made for 40 project areas similar to this one, Administrative Record, Tabs 41, 88. From this data, the Forest Service calculated a "tolerable soil loss" factor and measured that factor against the conditions and planned activities in the specific project area. The agency found that none of the planned activities would result in impacts exceeding the tolerable soil loss factor culled from the other, similar project areas. Administrative Record, Tab 88, at 15. Planned mitigation measures include 30–foot no cut zones along intermittent streams, 100–foot no cut zones along perennial streams, as well as compliance with Virginia's Best Management Practices for Forestry. Tab 37, Tab 88 at 11.

Mr. Krichbaum correctly points out that historical erosion data is not the same as a site-specific examination revealing actual effects on existing ecological communities, and that state management practices do not provide standards guarding against sedimentation in riparian areas. At the level of an environmental assessment, however, the agency is not acting arbitrarily when it uses

**15.** The 600 foot estimate was offered by Mr. Krichbaum himself.

historical data as a rough indicator of the need for further analysis, which is how the tolerable soil loss factor was used here. *See* Administrative Record, Tab 88, at 15 n. 1. This is in keeping with the essential function of an environmental assessment as opposed to an environmental impact statement, and with NFMA's rather broad mandate to insure that "soil, slope or other watershed conditions will not be irreversibly damaged" by timber harvesting. 16 U.S.C. § 1604(g)(3)(E)(i). The effects on indigenous species perhaps are not directly measured by the agency's approach, but that analysis is undertaken elsewhere in the agency's consideration of wildlife protection and biodiversity, and it is not undermined by any of the agency's findings regarding soil and water impacts.

As to Mr. Krichbaum's concern over sedimentation,[16] the court can only point to the environmental assessment, Administrative Record, Tab 88, at 16, where the agency sets forth its compliance with voluntary state management practices for the control of sedimentation. It may be that state standards for this pollution do not exist, but the state has indicated management practices designed to mitigate and monitor that pollution in the meantime. Moreover, the state's fisheries biologist was unconcerned about pollution of the Clayton Mill Creek, so long as proper access roads were constructed to minimize the accretion of sediment from logging activities near tributaries of the creek. Administrative Record, Tab 85.

Once again, the court must defer to the agency's adequate consideration of this project's environmental effects. Summary judgment will be granted as to count VII.

*Count VIII: Inadequate Cumulative Effects Analysis*

■ Cumulative effects are those which occur as a result of a cumulation of discrete impacts in the past and in the foreseeable future. 40 C.F.R. §§ 1508.7, 1508.27(b)(7). Plaintiff argues that the Administrative Record discloses no cumulative impacts analysis on a host of species, existing ecosystems, and

potential old-growth forest conditions. The court cannot agree with this assessment. The past and present condition of the Forest is under direct consideration at the Forest Plan level, and it is this consideration which has produced the management directions slated for management area 15. Concerns about fragmentation and edge effects, species impacts, and old growth were all considered in the articulation of a "desired future condition" for the area. At both the Plan and site levels, existing roads and prior logging were explicitly considered when it came to shaping the cutting units. The Forest Service indicates throughout the record that it intends no further disturbance in the area within the next ten years. Lastly, the future impact of a non-agency actor, the gypsy moth, was a motivating factor for the proposed timber sale.

In short, the consideration of past and future impacts is pervasive in the Administrative Record at all levels of the analysis. This claim, like so many of Mr. Krichbaum's claims, would require a level of analysis sufficient to stop all action in the Forest while every conceivable effect is catalogued. This is neither reasonable in light of the agency's multiple-use objectives, nor required by the statute. We are not dealing here with an agency that refuses to undertake reasonable forecasting of future environmental effects, and plaintiff's insistence on what to him is a more rigorous forecasting methodology is unavailing on an arbitrary and capricious standard. Summary judgment therefore will be granted as to count VIII.

*Count IX: Inadequate Range of Alternatives*

■ Before implementing àny project, the Forest Service is required to explore and evaluate all reasonable alternatives to the proposed action. 40 C.F.R. § 1502.14(a). Mr. Krichbaum contends that the direction in the Forest Plan toward limited logging in portions of this management area inappropriately makes this project a foregone conclusion. He suggests that alternatives to log-

---

**16.** Mrs. Shay Clanton also testified at the hearing on this subject. Her family draws its water supply from the Clayton Mill Creek, and she is concerned that that supply may become polluted by logging activity.

ging were not considered seriously, especially an alternative calling for forest restoration.

The essence of plaintiff's claim is an objection to the Forest Service's whole "zone"-oriented management style, but neither version of the Forest Plan is directly before the court. The court has already indicated that the agency may (and must) manage the Forest by emphasizing some goals at the expense of others, so long as all the relevant considerations are adequately evaluated and rationally balanced. The agency was concerned about promoting increased deer habitat, meeting area timber requirements, and preserving portions of the forest against defoliation. Administrative Record, Tab 114. These are all valid goals consistent with the management direction specified for area 14 in the old Plan, and area 15 in the Revised Plan.

Mr. Krichbaum's restoration and non-logging alternatives simply do not meet these goals. To the contrary, they would signal a wholesale rejection of the management direction specified for this area, and more fundamentally, a rejection of multiple-use principles as developed by the agency. So long as Congress requires this Forest to be managed with multiple-use principles, portions of the Forest must embody a compromise between "natural" Forest conditions and the need for Forest resources—consistent, of course, with NFMA's substantive commands. Unless it acts irrationally, this compromise is the agency's to strike, and it need not consider alternatives which are inconsistent with that compromise. Summary judgment therefore will be granted as to count IX.

*Count X: Unsubstantiated Finding of No Significant Impact*

Inasmuch as this claim is really an amalgam of more specific concerns articulated in other counts throughout the complaint, it will not be discussed here.

*Count XI: Inconsistency with the Forest Plan*

Each discrete action of the Forest Service must comply with the Forest Plan. 16 U.S.C. § 1604(i). This project has been certified to be in compliance with both the old Plan, and the revised version. Administra-tive Record, Tabs 89, 116. Nevertheless, plaintiff claims that the emphasis on deer and prerotation age tree cutting are inconsistent with the Revised Plan.

Much of plaintiff's first argument is an attack on the Revised Plan's emphasis on so-called "generalist" or "common" species such as deer in this management area. That portion of the argument takes issue with the Revised Plan itself, and will not be considered in this context. Nor will the court consider the argument that deer might be aided by natural forest processes rather than immediate intervention in the form of logging. The Revised Plan does not specify how species are to be promoted in this area, and certainly does not require an approach to that problem which ignores other featured goals, including timber production and defense against defoliation.

More on point is Mr. Krichbaum's assertion that deer are no longer the featured species in what is now management area 15. This much is true, but nothing in the Plan requires that the agency cannot undertake actions which benefit other species, especially when featured species will also benefit. One of those featured species, the wild turkey, *is* projected to benefit from the project. Administrative Record, Tab 88. As discussed, *supra*, deleterious effects on other species, including those featured in the Revised Plan, were adequately addressed.

As to plaintiff's next argument, regarding pre-rotation age cutting, the Forest Service points out that neither the old nor the new Plan tie the agency's hands to rotation schedules when the agency identifies a threat to the desired future condition from insects or disease. Administrative Record, Tab 2, at IV-32—IV-33; Tab 12, at 2-35, 3-152. Mr. Krichbaum has implied strongly that he perceives the gypsy moth threat as primarily a rationalization for a timber sale, but the agency's finding in this regard receives ample support in the record, and is therefore entitled to great deference.

For these reasons, summary judgment will be granted as to count XI.

**1120**

### III.

In summary, the court has determined that none of the counts in this case presents a genuine issue of material fact which could support a judgment for plaintiff under the governing legal standards. The motion of the federal defendants therefore will be granted, and an appropriate order shall this day issue.

### ORDER

A hearing was held before this court on February 1, 1994 upon plaintiff's motion for a preliminary injunction and the federal defendants' motion for summary judgment. At that time, the court took these motions under advisement, and extended the temporary restraining order for ten days to permit the court to render a written opinion. The court did rule, however, on the defendants' motion to dismiss and the motion of Deeds Brothers, Inc. to intervene as a defendant. For the reasons stated at the February 1 hearing and in the accompanying opinion, it is this day

### ADJUDGED AND ORDERED

that:

1) The motion of Deeds Brothers, Inc. to intervene as a defendant shall be, and it hereby is, granted.

2) The motion of the federal defendants to dismiss Shay and Kim Clanton as plaintiffs in this action shall be, and it hereby is, granted.

3) The motion of Shay and Kim Clanton to intervene in this action as plaintiffs shall be, and it hereby is, denied.

4) The motion of the federal defendants for summary judgment shall be, and it hereby is, granted.

5) The plaintiff's motion for a preliminary injunction shall be, and it hereby is, denied as moot. The temporary restraining order in this action is hereby vacated.

6) The grant of summary judgment against plaintiff in this action leaves no claim against any of the defendants, including defendant-intervenor Deeds Brothers, Inc. There has been no counterclaim. This action therefore shall be, and it hereby is, dismissed and stricken from the docket of the court.

The Clerk of the Court is hereby directed to send a certified copy of this order and the accompanying opinion to Mr. Krichbaum, Mr. and Mrs. Clanton, and all counsel of record.